AO 187 (Rev. 7/87) Exhibit and Witness List

# United States District Court

Southern **DISTRICT OF** Florida

U.S.A. v. Matthew Fisher

**EXHIBIT AND WITNESS LIST**

CASE NUMBER: 02-20857-CR-Seitz

| PRESIDING JUDGE TED E. Bandstra | PLAINTIFF'S ATTORNEY Steve Stallings | DEFENDANT'S ATTORNEY DAVID Rothman |
|---|---|---|
| TRIAL DATE(S) 3-3-03 | COURT REPORTER N/A | COURTROOM DEPUTY Patty FitzPatrick |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | Jvette Dominguez |
| 1A | | 3/2/03 | ✓ | ✓ | Flyer |
| 2 | | " | ✓ | ✓ | Complaint/arrest Affidavit |
| 3 | | " | ✓ | | |
| 4 | | " | ✓ | | Business Cards (2) Copies |
| | | | | | Rigoberto Olivera Dect MB Sworn |
| | | | | | + testified, Cross examined |
| 6 | | " | ✓ | ✓ | Photo |
| 7 | | " | ✓ | ✓ | Photo |
| 8 | | " | ✓ | ✓ | Photo |
| 9 | | " | ✓ | ✓ | Photo |
| | | | | | Srg. R. Chard Gollege Sworn + |
| | | | | | testified |
| | | | | | |
| Court Exhibit | | 3/3/03 | | | |
| | 1 | | ✓ | | depositions |
| | 2 | | ✓ | | " |
| | 3 | | | | " |
| | | | | | |
| | | | | | |
| | | | | | |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

# ATTACHMENTS <u>NOT</u> SCANNED

☐ LEGAL SIZE DOCUMENTS

☐ LARGE EXHIBITS

☐ DOUBLE SIDED DOCUMENTS

☐ EXTRADITION DOCUMENTS

☐ BOUNDED AND/OR TABBED PURSUANT TO LOCAL RULE 5.1.A.2.(b)

☒ OTHER _Photos_____

## PLEASE REFER TO COURT FILE

# WANTED PERSON

| | |
|---|---|
| Date: | **8/2/2002** |
| Case #: | **2002-26348** |
| Soc. Sec. #: | **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** |
| Name: | **Carl J. Marciano** |
| Alias: | **Matthew Jack Fisher** |
| Address: | **5401 Collins Ave. #830** |
| | **Miami Beach, FL 33140** |
| Height: | **6 Feet** |
| Age: | **57** |
| Sex: | **M** |
| Hair: | **Blonde/White** |
| Complexion: | **Medium** |
| Race: | **White** |
| BirthDate: | **8/18/1957** |



**OTHER INFORMATION BELOW**

There is PC to arrest the above listed subject on 13 counts of Sexual Battery on a child 12 years of age and older.  The subject drives a Black Nissan Maxima 4-dr unknown tag.  The subject claims to be a retired NYPD police officer who changed his identity in order to protect himself from the criminal element.  He is known to carry a firearm in a waist fanny pack as well as a firearm on an ankle holster.

FOR OFFICER SAFETY REASONS AND IN ORDER TO AVOID A BARRICADED SUBJECT SITUATION, AN ATTEMPT HAS NOT BEEN MADE TO CONTACT THE SUBJECT IN HIS APARTMENT.

PLEASE USE EXTREME CAUTION WHEN COMING INTO CONTACT WITH THE SUBJECT

An A-form has been completed and will be retained in RCC until Monday, August 5th.  Any unit coming into contact with the subject is requested to take him into custody and contact Detective Dominguez at extension 5080, or at pager (305) 250-0027.

**GOVERNMENT EXHIBIT**
Suppression 1
02-20857-CR-Seitz

**Miami Beach PD- Juvenile Div.**
**(305) 673-7776  ext. 5080**

**COMPLAINT/ARREST AFFIDAVIT**

02-08-26348

| OB'S Number | ☒ Felony  ☐ Misdemeanor  ☐ Traffic | Jail No | Police Case No |
| | ☒ Juvenile  ☐ Warrant | | 2002-26348 |

| IDS No. | Agency Code 02 | Municipal P.D. Def. ID No. | MDPD Records and ID No | Court Case No |

| DEFENDANT'S NAME  Last  First  Middle | DOB mo/day/yr | Sex | Race | Ethnic | Height | Weight | Hair | Eyes |
| MARCIANO,  CARL | 0 8/1 8/1 9 4 5 | M | W | | 600 | 195 | S/P | GRN |

| LOCAL ADDRESS  Street  City  State  Zip  Phone | Alias S S # 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 |
| 5401 COLLINS AVE.  #830  MIAMI BEACH  FL  33140  (305) 993-5577 | MATTHEW JACK FISHER 6/23/4 |

| PERMANENT ADDRESS  Street  City  State  Zip  Phone | Address Source  ☐ Verbal  ☐ Voter's I.D |
| S/A LOCAL | ☒ Driver's License  ☐ Other |

| BUSINESS ADDRESS  Street  City  State  Zip  Phone | Occupation  RETIRED | Place of Birth  NY |

| DRIVER'S LICENSE NO  State | Social Security No | Scars, Tattoos, Unique Physical Features |
| M625-130-45-298-0  FL | 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 | GUNSHOT WOUND TO STOMACH/BACK L. LEG |

| Weapon Seized? Type  ☐ Yes ☒ No | Arrest Date mo/day/yr  08/02/2002 | Arrest: Time  11:45 ☒ A.M ☐ P.M | Arrest Location (include name of business) 5401 COLLINS AVE. #830 (CARRIAGE HOUSE) | GRID | ☐ Dade ☒ City ☐ Out of ☐ Florida State |

| If Def. has Concealed Weapons Permit.  PERMIT #  W- | For Robbery, Burglary, F/A Viol: Suspected History of drug involvement?  ☐ Yes ☐ No | No Cases Cleared | Influence of Drugs  ☐ Yes ☒ No ☐ Unk | Influence of Alcoh.  ☐ Yes ☐ No ☒ Unk | Citizenship  USA | Resid Type ☒ |

| CO-DEFENDANTS  Last  First  Middle | DOB mo/day/yr | |
| 1  N/A | / / | ☐ In Custody  ☐ Felony  ☐ Juvenile  ☐ At Large  ☐ Misdemeanor |
| 2 | / / | ☐ In Custody  ☐ Felony  ☐ Juvenile  ☐ At Large  ☐ Misdemeanor |

| CODE | DRUG ACTIVITY  N N/A  P Possess | S Sell  B Buy  T Traffic | F Smuggle  D Deliver  E Use | K Dispense  L Distribute  O Other | M Manufacture Produce/ Cultivate | DRUG TYPE  N N/A  A Amphetamines | B Barbiturate  C Cocaine  E Heroin | H Hallucinogen  M Marijuana  O Opium Den. | P Paraphernalia Equipment  S Synthetic | U Unknown  Z Other |

| SIGNAL: | ☐ 100 | ☐ 150 | ☐ 200 | ☐ 250 | ☐ 300 | ☐ 400 |

| CHARGES | Activity | Type | Counts | STATUTE | D V | ☐AC ☐CAPIAS ☐BW ☐FW ☐PW ☐Cit ☐ | VIOLATION OF SECT |
| 1  SEXUAL BATTERY ON CHILD 12YOA + | N | N | 1 | 794.011(5) | | | 70-1 |
| 2  SEXUAL BATTERY ON CHILD 12YOA + | N | N | 10 | 794.011(8)(b) | | | |
| 3 | | | | | | | OF THE CODE OF |
| 4 | | | | | | | Miami Beach |

The undersigned certifies and swears that he has just and reasonable grounds to believe and does believe that the above named Defendant

On DURING THE YEARS 2000-2002 ___ At ___ ☐ A.M ☐ P.M (Time)  (CARRIAGE HOUSE) 5401 COLLINS AVE. #830 (Location, include name of business)

committed the following violation of law. Narrative (Be specific)  The defendant is the boyfriend of victim Veliz's mother and

resides at the above listed incident location.  During the years 2000, 2001, and 2002, the

subject on several occasions has reached under the bedsheets, reached underneath victim Veliz's

clothing, and fondled her breasts as well as reached underneath her clothing and underwear and

touched the outside of the victim's vaginal area with his index finger.  During those instances,

the defendant was acting in a familial or custodial manner as he is the victim's mother's

PAGE  1  OF  2

| Hold for Other Agency  Agency ___  Verified by ___  Swear that the above Statement is correct and true to the best of my knowledge and belief | ☐ HOLD FOR BOND HEARING. DO NOT BOND OUT (Officer Must Appear at Bond Hearing)  Sworn to and subscribed before me, the undersigned authority, this ___ 2 ___ day of ___ | I understand that should I willfully fail to appear before the court as required by this notice to appear that I may be held in contempt of court and a warrant for my arrest shall be issued. Furthermore I agree that unless otherwise by the court, ... |

I. DOMINGUEZ
Officer's Name (Print)

Officer's Signature

MBPD  080  02
Department Name  Court ID Number/Loc. Code

Deputy of the Court or Notary Public

Signature of Defendant: Juvenile and Parent or Guardian

GOVERNMENT EXHIBIT
Suppression 2
02-20857-CR-Seitz

32.02.09.0  Rev. 2/99

## COMPLAINT/ARREST AFFIDAVIT
### CONTINUATION

| OBTS Number | | Felony ☐ Misdemeanor ☐ Traffic | Jail No. | Police Case No |
|---|---|---|---|---|
| | | ☒ Felony<br>☒ Juvenile  ☐ Warrant | | 2002-26348 |
| IDS No. | Agency Code<br>02 | Municipal P.D. Def. ID No. | MDPD Records and ID No. | Court Case No |

| DEFENDANT'S NAME  Last        First        Middle | | DOB mo/day yr | |
|---|---|---|---|
| MARCIANO        CARL | | 0 8 / 1 8 / 1 9  4 5 | |

| ADDITIONAL CHARGES | Activity | Type | Counts | STATUTE | ☐ AC ☐ CAPIAS ☐ BW ☐ FW ☐ PWO☐ CIT # | VIOLATION OF SECT |
|---|---|---|---|---|---|---|
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | OF THE CODE OF |

boyfriend and they were staying in his apartment with him.  The incidents began when the victim Veliz was approx. 14 years of age and continued through the present 16 years of age.

Sometime during the month of July, 2002, while the victim DeLaTorre was visiting with her friend (Veliz) in the defendant's apartment, victim DeLaTorre was also fondled by the defendant.  Victim DeLaTorre was laying on the couch, covered by two (2) bedsheets, when the defendant sat next to her, reached underneath the bedsheets, and touched the exterior area of the victim's vaginal area with his index finger.  Victim DeLaTorre attempted to resist the defendant, but was unsuccessful in avoiding the fondling.

Hold for Other Agency

Agency _____ Verified by _____

I Swear that the above Statement is correct and true to the best of my knowledge and belief.

I. Dominguez

Officer's Name (Print)

Officer's Signature

☐ HOLD FOR BOND HEARING. DO NOT BOND OUT. (Officer Must Appear at Bond Hearing.)

Sworn to and subscribed before me, the undersigned authority, this _____ day of _____ 19____

_____
Deputy of the Court or Notary Public

☐ I understand that should I willfully fail to appear before the court as required by this notice to appear that I may be held in contempt of court and a warrant for my arrest shall be issued. Furthermore, I agree that notice concerning the time, date, and place of all court hearings should be sent to the above address. I agree that it is my responsibility to notify Clerk of the Court (Juveniles notify Family Division Juvenile Section) anytime that my address changes.

☐ You need not appear in court, but must comply with the instructions on the reverse side hereof.

1

1   IN THE CIRCUIT COURT OF THE
    ELEVENTH JUDICIAL CIRCUIT IN
2   AND FOR DADE COUNTY, FLORIDA

3   CRIMINAL DIVISION

4   CASE NO.  F02-22910   ORIGINAL

5
    STATE OF FLORIDA,
6
              Plaintiff,
7
    vs.
8
    CARL MARCIANO,
9
              Defendant.
10  _____/

11

12                          Office of the State Attorney
                            1350 N.W. 12th Avenue,
13                          Miami, Florida
                            Wednesday, September 25, 2002
14                          11:45 a.m. to 1:45 p.m.

15

16

17                    DEPOSITION OF

18          DETECTIVE RIGOBERTO OLIVERA

19

20      Taken before LOURDES M. RESTREPO, Court Reporter and

21  Notary Public in and for the State of Florida at Large,

22  pursuant to Notice of Taking Deposition.

23

24                    - - - -

25

COURT EXHIBIT
02-20857
CASE NO. CR-Suffz
EXHIBIT NO. 1

```
1    APPEARANCES:

2              (No appearance on behalf of the State.)

3

             RONALD GURALNICK,
4            BY:  RONALD GURALNICK,
             Specially Appointed Public Defender,
5            550 Brickell Avenue, Ph 1
             (305) 373 0066,
6            Miami, Florida 33131
             On behalf of the Defendant.

7

8                          INDEX

9

10   WITNESS                    DIRECT              CROSS

11   Detective Rigoberto Olivera  3                 - -

12

13

14

15

16

17

18

19                        - - -

20

21

22

23

24

25
```

3

```
 1   THEREUPON:
 2                 DETECTIVE RIGOBERTO OLIVERA
 3   was called as a witness by the Defendant and, having been
 4   first duly sworn, was examined and testified as follows:
 5                      DIRECT EXAMINATION
 6   BY *: MR. MORROW:
 7       Q.   Please state your name and official capacity, for the
 8   record.
 9       A.   Yes, sir.  I'm Detective Rigoberto Olivera.  I work
10   with the Miami Beach Police Department.  I'm assigned to the
11   Detective Bureau.  I'm a juvenile detective.
12       Q.   Juvenile detective.
13       A.   Yes, sir.
14       Q.   Okay.
15            And how long have you been with the department?
16       A.   Nine and a half years.
17       Q.   And how long in the juvenile department?
18       A.   One year.
19       Q.   Okay.
20            And prior to being an officer with your department,
21   were you in any other department?
22       A.   No, sir.
23       Q.   Okay.
24            The first thing I want to do is go over a couple of
25   witnesses.  I know who most of them are.  I want to know a
```

1   couple of the witnesses that were given to me by the state

2   attorney on their witness list, so I can see who are the major

3   players here.

4       A.   Okay.

5       Q.   Detective Dominguez is the lead in the case.

6       A.   Yes, sir.

7       Q.   Okay.

8            Then, we have Gullage.

9       A.   Sergeant Gullage.

10      Q.   Is it Rick?

11      A.   Yes.

12      Q.   And what was his participation in this?

13      A.   He's assigned to --actually, he's the person that is

14  in charge of the Juvenile Squad.  He's the sergeant in charge.

15      Q.   Does Dominguez work under Gullage?

16      A.   Yes.  And I also work under Sergeant Gullage.

17      Q.   So, who is the lead, actually?  Is it Gullage or is

18  it Dominguez?

19      A.   The lead detective on the case that was called in was

20  Detective Dominguez.

21      Q.   Okay.

22           And so, would it be fair to say that he's the head of

23  the juvenile division, Gullage?

24      A.   Yes, sir.  He's been charged with the juvenile squad.

25      Q.   Okay.

1          Now, does he in that position, Gullage, does he

2    coordinate --does he actually participate in the

3    investigation, talking to witnesses, et cetera?

4          A.   Yes.   He participates.

5          Q.   Okay.

6               And you are detective Olivera.

7          A.   Yes.

8          Q.   Detective Prieto, he's the computer forensic

9    examiner.   Is that right?   That's what I've been told?

10         A.   He works Economic Crimes.

11         Q.   Economic Crimes.

12         A.   Yes.

13         Q.   Okay.

14              Somebody told me he was the computer forensic

15   examiner.

16         A.   He does fraud, computer fraud and all of that.

17         Q.   Okay.

18         A.   If that is the title, I don't know.   I just know that

19   he works Economic Crimes.

20         Q.   Do you know what the, you know, what charges are

21   here?

22         A.   Yes, sir.

23         Q.   What does that have to do with economic crimes?

24         A.   Nothing.

25         Q.   What does that have to do with --I know there is a

1    computer that was seized from my client.

2       A.   Yes, sir.

3       Q.   And from being involved in other cases, sometimes

4    there is a pediphile, and he's got all kinds of kiddy porn on

5    the computer.  So, I can understand why you would want someone

6    who is a computer expert.

7       A.   Yes, sir.

8       Q.   But am I correct to say there is no economic crime

9    here?

10      A.   No, not that we know of, no.

11      Q.   Okay.

12           And so, the reason, I guess, that Prieto is involved

13   in this is because he's the computer expert for the

14   department.

15      A.   Not only that.  As assisting -- if you want me to go

16   into it.

17      Q.   Yeah.

18      A.   Basically, what happened was the call was in the

19   middle of the night.  Detective Dominguez responded.  She put

20   out a flyer for this gentleman as in questioning for the

21   charges lodged against him.

22      Q.   When you say flyer, for the record, what do you mean?

23      A.   It is like a BOLO sheet.  Be On The Look Out for this

24   person.

25      Q.   The Defendant.

7

1    A.   The Defendant, yes.  I don't know what his true name

2  is, but we'll get to that.  There had been police surveillance

3  since the allegations were made on the building.

4    Q.   There had been surveillance, merely looking for him

5  to arrest him or for other reasons

6    A.   Just to detain him.  The detective wanted to be

7  contacted, if he was detained or stopped.

8    Q.   Okay.

9         So, that's why there was surveillance waiting for him

10  to come back to his apartment?

11    A.   An apartment, yes, sir.

12    Q.   Okay.

13         Go on.

14    A.   So, we get there early in the morning to work.  Show

15  up to work at 7:30 in the morning.  We were actually briefed

16  on what was going on.

17    Q.   Right.

18    A.   We went out there, and we took over surveillance,

19  unmarked car, unmarked capacity.

20    Q.   When you say we, we were talking about Prieto.

21    A.   Sergeant Gullage.

22    Q.   So, Prieto is out there, also.

23    A.   Yes, along with two other detectives.

24    Q.   Okay.

25         Not knowing that there was a computer involved.

Official Reporting Services, 524 S. Andrews Ave., Fll, Fl 33301

1      A.   Correct.

2      Q.   Why would he be there?

3      A.   Just to assist.  He's in the criminal investigation

4   division.  We needed more people than two.  So, we took along

5   as many bodies as we could that day.

6      Q.   You thought that you were arresting somebody who was

7   dangerous.

8      A.   Yes, sir.

9      Q.   Okay.

10     A.   The information that was gathered through, I guess,

11  that part.  I don't know.  What was issued in the flyer is

12  that this gentleman was possibly a retired police officer from

13  New York and that had in possession numerous weapons.

14     Q.   Okay.

15          And how did they get that information?  How did they

16  get that information that he was a retired police officer from

17  New York?

18     A.   That I could not tell you.  I mean, unfortunately,

19  the lead detective is sick.  I couldn't tell you.  She has the

20  paperwork.  She was the one that had the information.

21     Q.   Dominguez.

22     A.   Yes.  Like I said, it might have been through the

23  victims themselves or, you know, people that she spoke to.

24     Q.   Okay.

25          As far as the weapon, only Dominguez would know that.

1    A.    Yes.

2    Q.    All right.

3          And as far as the weapons are concerned, you don't

4    know how she obtained that information.

5    A.    No, sir.

6    Q.    Okay.

7          So, Prieto, does he play an active part, in this

8    case?

9    A.    Yes.

10   Q.    Okay.

11         And then, we have Detective Wolfe.

12   A.    Yes.

13   Q.    What part does he play in this?

14   A.    She.

15   Q.    She, I'm sorry.

16   A.    She also works for Economic Crimes.

17   Q.    Okay.

18   A.    And she assisted in going out there to do the

19   surveillance part and the entering.

20   Q.    That's it.

21   A.    Yes.

22   Q.    Surveillance and entering only.

23   A.    Yes.

24   Q.    Prieto played more of a roll.

25   A.    Yes.

1     Q.    Okay.

2           Detective Sinkes, what part does he play in this?

3     A.    He's also in the Economic Crimes.

4     Q.    So, would I be fair to say --if I'm not, tell me

5     please.   He plays the same part basically that Wolfe does,

6     surveillance and arrest.

7     A.    That's it.

8     Q.    Now, one of the witnesses on this list is Dr. Silla

9     from Jackson Memorial Hospital.

10    A.    Uh-huh.

11    Q.    Now, I received a report from him for one of the

12    victims but not both of the victims.   So, I'm not sure whether

13    both of the victims went to the Rape Treatment Center or were

14    taken to the Rape Treatment Center.

15          I know that victim J.D. was the subject of the report

16    that I received.   She was at the Rape Treatment Center.   Do

17    you know, whether or not, either alleged victim V.V. was seen

18    at the Rape Treatment Center?

19    A.    That I have no information, sir.   I did not respond

20    when the original call went out.

21    Q.    Okay.

22    A.    The on call detective, which was Detective Dominguez

23    is the one who responded.

24    Q.    I see.

25    A.    If they were taken to the Rape Treatment Center, I

1  have no information on that.

2      Q.   Okay.

3      A.   My ordeal started at 7:30, when we arrived for normal

4  work hours.

5      Q.   Your ordeal.

6      A.   Yes.  My ordeal with this.

7      Q.   Okay.

8           Now, that was the second witness list.  That was an

9  amended list.  Now, I have the other one.  Okay, no problem.

10 I know who the other ones are.  Okay.

11          Now, let's do this by the numbers.  How do you become

12 involved, in this case?

13     A.   7:30, I believe, it was Friday morning.

14     Q.   Yeah.

15     A.   I get into work, normal work hours, 7:30.  After roll

16 call, we're advised that there was a call that was handled.

17 My sergeant advised there was a call that was handled by

18 Detective Dominguez overnight, and that they were --she was

19 seeking this person.  She had put out a flyer for this person.

20     Q.   In other words, this whole thing started from a call.

21     A.   Yes.

22     Q.   Right.

23     A.   Sexual allegations made against The Defendant.

24     Q.   Okay.

25          Now, who did that call come from?

1    A.   That I have no information.

2    Q.   Was it an anonymous call?

3    A.   I have no information on that, sir.

4    Q.   Who knows that?

5    A.   That would be Detective Dominguez.

6    Q.   Okay.

7    A.   When we get involved, a uniform patrol officer

8 already has arrived and done his original Offense Incident

9 Report.  That will detail who made the call and what the

10 allegations are and victim and suspect information.

11   Q.   It would be Detective Dominguez who could give me

12 that information.

13   A.   Yes, sir.

14   Q.   Was that call recorded?

15   A.   Yes.

16   Q.   Okay.

17        And who was in charge of that tape?

18   A.   Our Public Safety Information Unit.  You could

19 request a copy, I'm sure.

20   Q.   Do you know, at least, whoever was on the other end

21 of the phone, were they seeking anybody in particular?

22   A.   I have no clue.  Like I said, they call either 911 or

23 they call the non-emergency number, and they just make the

24 complaint.  The dispatcher makes the call, puts the call out

25 to the patrol units, who in turn, go out there and

13

 1   investigate.

 2          Meaning, they'll take the information down.  They saw

 3   it fit to call in a juvenile detective, and that's where

 4   Detective Dominguez gets called in.

 5      Q.   Okay.

 6          So, the call comes in.  I guess, somebody --what

 7   happens, then?  Someone is assigned to the case to check it

 8   out further?

 9      A.   As of when they --the call goes into the police

10   department.  Dispatcher dispatches a patrol unit, a uniform

11   unit to go out there and investigate whatever allegations are

12   made.  They go out there.  They speak to the party who's

13   making the allegations.

14      Q.   They go out to talk in person to the one who made the

15   telephone call, if it wasn't an anonymous call.

16      A.   Yes.  And they take the police report, and it is

17   called the Offense Incident Report, and then --

18      Q.   Let me just stop you there.  Do you know who the

19   uniform patrol officers were who went out there?

20      A.   No, sir.  That will be on the Offense Incident

21   Report.  I have no clue.

22      Q.   We'll get to that.

23      A.   Yes.

24      Q.   Okay.

25          And so, they would have made a report themselves.

14

 1     A.   They will take the initial report, yes.

 2     Q.   Right, okay.

 3     A.   Just detailing the allegations made against the

 4  subject, and like I said, victim information, reporting

 5  person's information and the suspect's information.

 6     Q.   And they do an incident report.

 7     A.   Yes, sir.  It is called the Offense Incident Report.

 8     Q.   Okay.

 9          Now, you weren't there when that happened.

10     A.   No, sir.

11     Q.   Did you read the Offense Incident Report?

12     A.   No, sir.

13     Q.   Okay.

14          So now, I'm just trying get the procedures down

15  first.  So, would you bear with me a second?  Excuse me.

16                    (A brief interruption.)

17  BY MR. GURALNICK:

18     Q.   Sorry, okay.

19          So, they go out.  They do a report.  And then, what

20  happens?

21     A.   The patrol units, they will notify their sergeant,

22  their supervisor, and he will make a determination if it

23  merits calling for a juvenile detective.

24     Q.   And since Olivera is the lead --

25     A.   No.  Dominguez.  I'm Olivera.

1    Q.   I mean, Dominguez.  Since Dominguez is the lead in

2   the case, that would have been the person this would have been

3   assigned to.

4    A.   What happens is the patrol sergeant contacts the

5   dispatcher and requests a juvenile detective to respond out to

6   the scene.

7        They, in turn, beep the sergeant in charge of the

8   Juvenile Squad, which is Sergeant Gullage.  He's the one that

9   okays the sending out of Dominguez, and they notify her

10  through beeper.  She responds out there.

11   Q.   Okay.

12       So then, the usual procedure is once someone is

13  assigned to the case to check it out further, in this case,

14  Dominguez, do they go out and arrest somebody or do they go

15  talk to that person or what happens?

16   A.   Once we get the case, like she gets the case.  She

17  interviews the victims, the reporting person, takes taped

18  statements, if it merits taking the taped statement, and then,

19  goes out and tries to contact the suspect or the subject.

20       If that doesn't pan out, what they do is they issue a

21  BOLO or a Be On The Look Out just for questioning against the

22  allegations made against him.

23   Q.   In reality, in this case, isn't it a fact that the

24  way this case got started was that the mother of an alleged

25  victim, J.D. --the mother's name is --I can't pronounce it.

1   It is Guiga DeLaTorres --brought her daughter, who is J.D., as

2   well as V.V., the other alleged victim, down to the police

3   station?

4      A.   That could have been.  Like I said, I had never read

5   the Offense Incident Report.

6      Q.   Okay.

7      A.   It could have happened that way.  They could bring

8   them to the station or they could call from the location and

9   an officer would be dispatched there.

10         If she came to the police station, then it will be

11   handled where we call at RCC, which means the Report Control

12   center, RCC.  We have the front desk always manned by one or

13   two uniform police officers.

14         They probably are the ones that took the initial

15   police report.  Like I said, I have no information cause I

16   don't believe I ever read the Offense Incident Report.

17      Q.   Okay.

18         So, what you were telling me before is the usual

19   procedure how these things work.

20      A.   Correct.  Yes, sir.

21      Q.   And of course, the unusual could happen, whereas in

22   this case, the mother actually brings the kids down to the

23   police station.  Right?

24      A.   Yes.  But it follows the same pattern that an officer

25   needs to contact his supervisor, who in turn contacts the

```
 1   dispatcher and requests a juvenile detective to respond.
 2          That was probably, I think, early in the morning.
 3   They contact the supervisor, which is Gullage.  Then, he okays
 4   the dispatcher to contact the on call.  We're all on call.
 5      Q.   So, actually if she did come down to the police
 6   station, the same process would be involved.
 7      A.   Yes, sir.
 8      Q.   Okay.
 9          They speak with the victim.
10      A.   Yes.
11      Q.   They'd speak with whatever witnesses.
12      A.   Yes.
13      Q.   They'd try and speak with the alleged perpetrator.
14      A.   Yes.
15      Q.   And or make an arrest, right?
16      A.   Right.
17      Q.   Okay.
18          Now, do you personally ever speak to -- you know, I
19   want to pronounce this correctly (indicating).  Are you latin?
20      A.   Yes.
21      Q.   What is the correct pronunciation of this name
22   (indicating)?
23      A.   Guiga.
24      Q.   We'll cal her Mrs. DeLaTorres.  I'll say, senior,
25   Mrs. Senior DeLaTorres.  We'll be able to distinguish.
```

```
 1      A.    Okay.

 2      Q.    Did you ever speak to Mrs. Senior DeLaTorres?

 3      A.    No, sir, I did not.

 4      Q.    Were you ever present when she was speaking to

 5  somebody else that you overheard?

 6      A.    No, sir.

 7      Q.    Were you ever present when either of the alleged

 8  victims spoke to anyone that you overheard?

 9      A.    No, sir.

10      Q.    Did you ever speak to either the alleged victims

11  directly?

12      A.    No.

13      Q.    Or did they speak to you directly?

14      A.    No, sir.

15      Q.    Okay.

16            Was a tape recorded statement made of the alleged

17  victims?

18      A.    I have no knowledge of that, sir.

19      Q.    What is the usual procedure?

20      A.    The person --like I said, I wasn't there, when

21  Detective Dominguez came on --

22      Q.    Right.

23      A.    --and took the initial investigation, if she did

24  take a taped statement, I guess, when you deopse her, she's

25  going to let you know.  I have no information.  If there was a
```

```
 1   taped statement made, it was a written statement.  I have no
 2   information on that.
 3        Q.   You never read them or wrote them.
 4        A.   No.  I never even met or saw either victim or the
 5   complainant.
 6        Q.   Okay.
 7             In one of these reports (indicating), I don't recall
 8   which one off the top of my head cause I have numerous
 9   reports, I believe, there is a serious error, and you may or
10   may not know anything about this.
11        A.   Okay.
12        Q.   The brother of the alleged victim V.V. in one of the
13   statements is alleged that he made a statement at the police
14   station about sexual, being sexually abused, as well.  I know
15   for a fact that he never did that.
16             Do you know anything about that?
17        A.   No, sir.
18        Q.   Okay.
19             So, you don't know whether he did or didn't.
20        A.   No, sir.
21        Q.   Okay.
22             Did you ever speak to the grandmother of V.V., who is
23   an alleged victim --
24        A.   No, sir.
25        Q.   --or her mother, Lucia Calero?
```

1     A.   No, sir.

2     Q.   Do you know who Lugi Giovanni Rodriguez is?

3     A.   Lugi.

4     Q.   Lugi Giovanni Rodriguez.

5     A.   No, sir.

6     Q.   Do you know who Adrianne Llamas (phonetic) is?

7     A.   No, sir.

8     Q.   Okay.

9          So now, how do you get involved in this?

10    A.   Okay.  Friday morning, when I come in, report for

11   work, after roll call, I get a debriefing on what is going on

12   the night before this call that went out, and that Dominguez

13   had responded.

14    Q.   Responded to what?

15    A.   To the station for this call, reference to this call.

16    Q.   Okay,

17    A.   The sergeant provided us with a BOLO.  He says

18   Detective Dominguez is looking for a guy.  I know for a fact

19   that patrol units are out there to keep an eye out on the

20   building just in case he leaves cause she wants him for

21   questioning.

22    Q.   Okay.

23         So, what --

24    A.   We take over the patrol position.

25    Q.   Surveillance.

1       A.   Surveillance.

2       Q.   So, that's how you first got involved in this

3  surveillance.

4       A.   Yes, sir.

5       Q.   Okay.

6            Do you know why The Defendant has numerous aliases

7  and numerous different identifications, such as social

8  security cards and passports, et cetera, under the name of

9  other people?  Do you know why?

10      A.   I assisted on when Dominguez interviewed him, and

11  then, he told us what it was; that he worked with law

12  enforcement.  That's as much as we got into it.

13      Q.   Okay.

14           So then, you don't know that he works with Richard

15  DeGregory, U.S. Attorney.

16      A.   No.

17      Q.   You don't know that he works with customs agents.

18      A.   No.

19      Q.   And you don't know that he works with the FBI.

20      A.   No.

21      Q.   Okay.

22           Now certainly, a person who is doing that might

23  require certain aliases, correct, to protect their identity,

24  otherwise, they're of no value.

25      A.   I have never worked in that type of a period, so I

```
 1   can't say what is required or not.

 2        Q.   Okay.

 3             Have you ever used anyone --have you ever been in an

 4   undercover capacity?

 5        A.   With aliases, no.

 6        Q.   You always use your name.

 7        A.   Just never in that type of an investigation; no, sir.

 8        Q.   Okay.

 9             Have you ever worked with anyone who does use

10   aliases?

11        A.   In that capacity, no.

12        Q.   In what capacity?

13        A.   Meaning in nicknames, yes.  But not in that capacity,

14   where you have drivers license and other different I.D.s with

15   different names.  I have never.

16        Q.   Have you ever worked with anyone who's an undercover

17   operative, such as The Defendant here?

18        A.   Only police officers.

19        Q.   Only police officers.

20        A.   Yes, sir.

21        Q.   They use their real names.

22        A.   No.  Not that I know of.

23        Q.   The reason they don't is --

24        A.   Safety, security.

25        Q.   So, that they'll be safe.
```

1    A.   Yes.

2    Q.   And so, that no one will know they're police

3 officers.

4    A.   Correct.

5    Q.   They'll be able to check, you know, they know their

6 names.  They can check them on a computer, get some

7 information about them, right?

8    A.   Correct.

9    Q.   Okay.

10        In their undercover capacity in the instances that

11 you were involved with these other officers that we're

12 speaking about, did they ever have identification to show that

13 they were other than police officers?

14    A.   Not that I know of.  I've never asked.

15    Q.   So, you don't know.

16    A.   No.

17    Q.   Okay.

18        When you went out there to surveill pursuant to the

19 BOLO to arrest The Defendant --

20    A.   We're not going to arrest him.  We were going to

21 detain him for questioning.

22    Q.   Okay.

23        You were going to take him into custody.

24    A.   Right, for questioning.  Yes, sir.

25    Q.   Okay.

```
 1            So, you may not be arresting, but you are taking him

 2   into custody.  When he's detained and taken into custody, he

 3   can't leave.

 4        A.   No, not at the moment.  No, sir; because of the

 5   severity of the allegations.

 6        Q.   At that point, he can't leave.  He's in your charge.

 7        A.   Correct.

 8        Q.   Right?

 9        A.   Yes, sir.

10        Q.   Okay.

11            Now, when you went out there for the first time, you

12   went there for surveillance.  Is that the time you arrested

13   him?

14        A.   Yes.

15        Q.   Okay.

16            And did you have an arrest warrant?

17        A.   No, sir.

18        Q.   Okya.

19            Did you have a search warrant?

20        A.   No, sir.

21        Q.   So, at that point in time, if you had been sure that

22   he, in your own mind or that there was enough evidence to

23   arrest him, you would have done so.

24        A.   Yes.

25        Q.   You wouldn't have just put him in custody.  He would
```

1  have been arrested.

2      A.   All I was following was my orders, which were to

3  locate the person, detain him cause Dominguez had to question

4  him.   That's it.

5      Q.   I understand.   Am I correct to say since he's taken

6  into custody and not under arrest --

7      A.   Right.

8      Q.   --if the situation was that you had enough

9  information to arrest, that's what you would have done.

10     A.   To arrest, of course.

11     Q.   Right.

12          And to do that, you would have to have an arrest

13 warrant, right?   If the felony hasn't been committed in your

14 presence, you have to have an arrest warrant, right?

15     A.   Yes, sir.

16     Q.   The felony was not committed in your presence.

17     A.   To make an arrest and to take him into custody are

18 two different things.

19     Q.   I understand.   I'm trying to distinguish between the

20 two.

21     A.   Okay.

22     Q.   Now, if the felony was not committed in your

23 presence, the alleged felony --

24     A.   No, it was not.

25     Q.   If you had gone out there to arrest someone, you

1    would have had to have an arrest warrant, correct?

2        A.   Yes, sir.

3        Q.   Okay.

4             Now, did The Defendant ever sign a Miranda Rights

5    Waiver Form?

6        A.   Before questioning?

7        Q.   Absolutely.

8        A.   Yes.

9        Q.   Okay.

10       A.   When he was taken down to the station, when he was

11   going to be interviewed, he was read miranda.  He signed off

12   on it.

13       Q.   Were you there?

14       A.   Yes, sir.

15       Q.   Okay.

16            He's definitely a suspect, at this point.  No doubt.

17       A.   Yes, sir.

18       Q.   So, how come his Miranda Rights weren't read to him,

19   at the time that he was taken into custody?

20       A.   Cause at the time, we were not going to question him

21   on the allegations.  We were not going to be doing the

22   questioning.  The questioning was going to be done by

23   Detective Dominguez, which had all of the information, and it

24   was her case.

25       Q.   Well, let me ask you this:  You've been a police

```
 1   officer long enough to know that people can make spontaneous
 2   statements.
 3        A.   Yes, sir.
 4        Q.   Okay.
 5             Now, do you not feel it is your obligation since he's
 6   already a suspect to mirandize him, so that he doesn't make
 7   any of those statements?
 8        A.   No.
 9        Q.   You don't.
10        A.   No, sir.
11        Q.   Okay.
12        A.   If he starts saying something, if he starts
13   blabbering out, then, we'll go through miranda.  But we're
14   there just to detain him, put him in custody, bring him to the
15   station.  That was our objective.
16        Q.   Was he taken in custody?
17        A.   At first, yes, sir.
18        Q.   So, his custody is in handcuffs.
19        A.   Yes, sir, at first, yes.
20        Q.   And usually, when people are arrested, they're in
21   handcuffs, right?
22        A.   Yes, sir.
23        Q.   Okay.
24             Do all people in custody require handcuffs?
25        A.   Not all, but --
```

1    Q.    Why did he?

2    A.    Because the information was that he had numerous

3   weapons in the apartment.

4    Q.    Okay.

5    A.    For our safety, we at the point where we go into the

6   apartment, there was somebody else there.   We put him in

7   custody for our safety.

8         We told him, these are just going on temporariy just

9   to control you and for our safety and yours, we told him,

10   cause I put handcuffs on him, and I say the same thing to

11   everybody, at the time.

12    Q.    Did somebody tell him, you are a suspect and these

13   are what you are suspected of doing, so that he would know why

14   he was going with you?

15    A.    Yes, sir.

16    Q.    Who told him that?

17    A.    I did.

18    Q.    You did?

19    A.    Yes, sir.

20    Q.    Okay.

21         I think you said, correct me if I'm wrong, that you

22   don't recall how they found out the information about the guns

23   in the apartment.

24    A.    No.

25    Q.    That's an apartment, right?

1    A.   It is an apartment.

2    Q.   Okay.

3         When you went to the apartment --I assume that is

4    where you first came in contact with him.

5    A.   Yes.

6    Q.   You could have arrested him outside, taken him

7    into --

8    A.   Yes.

9    Q.   What you did is you went up to his apartment.   Did

10   you knock on the door?

11   A.   No.   We went to the building manager.   Like I said,

12   the information we had, we had numerous weapons, that he was a

13   retired police officer in New York.

14        We went to the building manager and asked her, can

15   you ask this gentleman to come down, so we can take him into

16   custody away from his apartment.   She tried several times.

17   Q.   No answer.

18   A.   It was busy.

19   Q.   Okay.

20   A.   It was busy.   What we did is we took the security

21   guard from the building cause we were all in plain clothes.

22   All we had was our I.D. and badges and guns to identify

23   ourselves with.

24        We had a marked unit waiting outside.   What we did is

25   we took the security guard, so he could see a friendly face,

1   and we had him knock at the door, and this gentleman came to

2   the door.   We identified ourselves as police officers, and we

3   took him into custody and detained him there.

4       Q.   Okay.

5            Now, how many of you were there, police officers?

6       A.   Five, I believe.

7       Q.   And would I be correct to say you were all armed?

8       A.   Yes.

9       Q.   So, you knock.

10      A.   Yes.

11      Q.   You identify yourselves.

12      A.   But we have the security guard knock.   He answered.

13  I am standing next to the security guard.

14      Q.   He opens the door.

15      A.   Yes.

16      Q.   And what happened, then?

17      A.   We identify ourselves.   Miami Beach police officers.

18  We go in, and we secure him.   I put handcuffs on him.   I said,

19  this is temporary, you know.

20      Q.   That was the first thing you did.

21      A.   Yes, sir.

22      Q.   Was the cuffs on him?

23      A.   Yes, sir.

24      Q.   Then, you looked for the guns.

25      A.   No.   Then, we walk him.   We sit him down in the sofa.

1    I said, there has been allegations made.  You're going to be

2    transported to the station, you know, to be questioned.

3        Q.   Okay.

4        A.   I said, are you Mr. Carl Marciano, and he said no.

5    He used Mathew Fisher.

6        Q.   That's his real name.

7        A.   I said, okay, sir.  I mean, do you have any I.D?  He

8    goes, they're in my room.  When we went into the apartment,

9    like I said before, there was a female in the bed, sleeping on

10   the bed.

11       Q.   Sleeping in the bed.

12       A.   Yes.

13       Q.   An adult female.

14       A.   An adult female.

15       Q.   Was that his girlfriend?

16       A.   He identified her as his girlfriend.

17       Q.   Did he say, for the record, that was Lucia Calero?

18       A.   We asked, who is this.  He said, my girlfriend.

19       Q.   Okay.

20       A.   I dealt with Mr. Mathew Fisher.

21       Q.   What time was this, now?

22       A.   This must have been --an approximation.

23       Q.   Yeah.

24       A.   I would say between nine and ten.

25       Q.   P.m.

1    A.   A.M.  Friday morning.  Yes, sir.

2    Q.   Okay.

3    A.   So, I tell him, what's going on.  There are

4  allegations made against you.  You're going to be transported

5  down to the station, and you're going to be questioned.

6         He said, fine.  I said do you have any weapons in the

7  apartment.  He says, yes.  I have numerous weapons.  Where are

8  they?  He says, closet.  He says, in the room.  I said, I need

9  to search for them.  He said, no problem.

10   Q.   Did he direct you to where they were?

11   A.   No.  He goes, no problem and go ahead and look for

12  them.  I personally don't know who picked what gun out cause

13  they were spread all around the room.

14   Q.   The room.

15   A.   Yes.

16   Q.   He said to you, all the guns are in what room?

17   A.   The bedroom.

18   Q.   The bedroom.

19   A.   Yes, sir.  He says, they're in the bedroom.

20   Q.   Okay.

21        And were they in the bedroom?

22   A.   They were in the bedroom; in the closet, he said.

23   Q.   But in the closet of the bedroom.

24   A.   Yes, sir.

25   Q.   They were all in the bedroom, where he said.

1       A.   Yes, sir.

2       Q.   And that's where you found all of the weapons.

3       A.   Yes, sir.  We said, can we look.  He said, go ahead.

4  He gave us consent.

5       Q.   Now, he's already in handcuffs.

6       A.   Yes.

7       Q.   He's told you where the guns are.

8       A.   Right.

9       Q.   You got the guns.  Right?

10      A.   Right.

11      Q.   Okay.

12           So now, he's in custody.  You got five armed men

13  there.  He is unarmed.  He's in cuffs, and you got the guns.

14      A.   Right.

15      Q.   Okay.

16           Did anybody search the rest of the apartment, after

17  you found the guns?

18      A.   Not where we were standing, which was the living

19  room.

20      Q.   Any place in the apartment?

21      A.   It was all dealt with where he told us, where the

22  guns were, which was the bedroom and the closet.  That's it.

23      Q.   The closets in the bedroom.

24      A.   Yes, sir.

25      Q.   So, you are telling me that the rest of the apartment

1   was not searched.

2        A.   Not to my knowledge.

3        Q.   Okay.

4             So, everything that was seized from the apartment was

5   seized at the time that you took him into custody.

6        A.   Yes.

7        Q.   Right?

8        A.   Yes, sir.

9        Q.   Okay.

10            And so, if things were seized from other parts of the

11  apartment, other than the bedroom and the closet in the

12  bedroom, where he said, you have no knowledge of that.

13       A.   Well, the computer, that was in the living room at

14  the entrance.

15       Q.   Where was that?

16       A.   That was at the living room almost to the hallway

17  between the door leading into the bedroom and the living room,

18  itself.

19       Q.   It was within view.

20       A.   Yes.  Plain view.

21       Q.   You didn't have to go into a drawer.

22       A.   No.  Plain view.

23       Q.   Okay.

24            Anything else, other than the computer and the stand

25  the computer is on?  If they took that, if there are tapes

1  that are on top of the table, those things were taken.

2      A.   Yes.

3      Q.   Right.

4      A.   I think the hard drive was taken, and another small,

5  I guess, memory, you know.  It was taken, you know, it was

6  like --

7      Q.   Anything else taken from the apartment?

8      A.   There was also located, like I said, when I went to

9  the bedroom, it was --there was a bag that had multiple I.D.s

10  including I.D. from NYPD, retired New York Police Department

11  with different names.  There were passports, different names

12  with his picture.

13      Q.   Where were these things?

14      A.   When I saw them, he had them on top of --they were on

15  top of the bed.

16      Q.   Who put them there?

17      A.   Like I said --

18      Q.   He didn't have them lying out on the bed so that when

19  you came in, everything was waiting for you.

20      A.   Right.

21      Q.   Somebody who was with you laid them out on the bed.

22      A.   Right.

23      Q.   Do you know where they got them from?

24      A.   No, sir.  I don't know where they got them from.

25      Q.   If some of these things were in drawers, okay, or in

1    other closets in the apartment and you didn't have a search

2    warrant, you wouldn't be able to go in there and look.  Would

3    you, sir?

4        A.    No.

5        Q.    Okay.

6        A.    Unless on this case, where he gave consent to go

7    ahead, look for the guns, for the I.D.s  When we asked him,

8    when I asked him, sir, do you have an I.D. --cause he told me

9    a different name than what we had.

10       Q.    He told you where everything was.

11       A.    He said everything was in the bedroom and in the

12   closet.

13       Q.    But this is --there are other rooms in this

14   apartment.

15       A.    Yeah.  But everything --no, no.  It was only a one

16   bedroom apartment.

17       Q.    There is a kitchen.  There is a living room.  There

18   is a dining room, right?

19       A.    Yes, sir.

20       Q.    Okay.

21             There is a bathroom.

22       A.    But it is all connected.  The dining room and the

23   living room, it is all a one bedroom apartment.  It is all --

24       Q.    Of course, they're all connected.  The rooms are

25   connected.  It is an apartment like all other apartments,

Official Reporting Services, 524 S. Andrews Ave., Ell, Fl 33301

1  right?

2      A.   Right.

3      Q.   So, the bottom line is you didn't have a search

4  warrant.

5      A.   No.

6      Q.   Which therefore, unless something was in plain view,

7  you didn't have the authority to search other closets or to

8  search other drawers unless he consented to that.

9      A.   Yes, sir.

10     Q.   Did he consent to search the entire apartment?

11     A.   All he said was out of his mouth was go ahead and

12  search.  And we said, you know, can we search for the guns,

13  you know?  Do you have an I.D.?  He said, yes.   It is in the

14  room.   Go ahead and search.   That is all he said out of his

15  mouth.

16     Q.   So, here is what I'm saying.   He said the guns are in

17  the bedroom and or in the closet and so is the identification,

18  and that's where they were found.

19     A.   Yes, sir.

20     Q.   Right.

21     A.   Yes, sir.

22     Q.   And he said, you can go get them.   Something to that

23  effect, right?

24     A.   Yes

25     Q.   But he didn't say to you, you can search my entire

1    apartment.

2        A.   No.

3        Q.   Okay.

4             And so, it will be an illegal search if someone did

5    search the rest of the apartment unless he consented to do it.

6        A.   Right.

7        Q.   Which he didn't do.

8        A.   And we didn't search the whole rest of the apartment.

9        Q.   Okay.

10            So then, if you're right, and I'm not saying you are

11   not.  I wasn't there.

12       A.   Right.

13       Q.   But anything that was taken from his apartment, which

14   is now evidence, in this case -- I have a list of what was

15   taken --would all have to come from the bedroom or the bedroom

16   closet, where he consented for you to go, upon your request

17   for the gun and I.D.

18       A.   Yes.  And the only thing that was taken was the

19   computer, the hard drive.

20       Q.   That was in plain view.

21       A.   Yes, sir.  Other than that, I have no knowledge of

22   anything else taken.

23       Q.   Okay.

24            Now, the computer --

25       A.   Yes.

39

1     Q.   I take it that the reason that was taken is because

2   there was an allegation of a sexual crime.

3     A.   Correct.

4     Q.   And sometimes, if someone is a predator, a sexual

5   predator, they may have kinky porn or whatever.  That would be

6   valuable evidence.

7     A.   Yes, sir.

8     Q.   That's why the computer was taken.

9     A.   Yes, sir.

10     Q.   Would it be also fair to say it might have something

11   to do with his various identifications, the computer, right?

12     A.   Yes, sir.

13     Q.   Okay.

14          Now, what did they find on the computer?

15     A.   As far as I know, the results are not back in yet.

16   We don't do the forensics on the computer.

17     Q.   Would I be fair to say that if there is nothing of

18   value on the computer regarding the issues we spoke of, okay,

19   that that's not evidence that is going to be, in this case

20   because there is no incriminatory evidence?

21     A.   Of course.

22     Q.   Right?

23     A.   Yes.

24     Q.   Okay.

25          Now, the guns --did you know that one of those guns

1    doesn't even belong to The Defendant?   Two of the guns don't

2    belong to The Defendant.

3        A.   No knowledge.   I know that they were ran through FCIC

4    /NCIC to make sure they were not stolen.

5        Q.   Right.

6             And they weren't.

7        A.   I didn't do that.   And yeah, it did not show that

8    they were stolen.

9        Q.   And he doesn't have any criminal record, does he?

10       A.   No, as far as I know.

11       Q.   Was he checked out?

12       A.   I checked it out.

13       Q.   NCIC.

14       A.   Yes, NCIC.

15       Q.   Nothing national, nothing --

16       A.   Nothing, correct.

17       Q.   Has he ever even been arrested before?

18       A.   Not of our knowledge, no.

19       Q.   And you checked that out.

20       A.   Correct.

21       Q.   Did you know that he was the victim of two gun-shot

22   wounds on separate incidents?

23       A.   No.   I had no clue.

24       Q.   You don't know whether he received them in the line

25   of duty for the government.   Do you?

1      A.   No, sir.

2      Q.   Okay.

3           Would I be fair to say that the way for me to find

4    out if anything of value to the police was on the computer

5    would be from either Prieto or Wolfe?

6      A.   No.   Like I said, we don't do the forensics at the

7    department.  We have either, I believe, it is either

8    with --his computer, we turn it over to Secret Service.   They

9    do the forensics.

10     Q.   Really.

11     A.   Yes, sir.

12     Q.   I thought that you guys had your own lab like

13   Metro-Dade.

14     A.   No.   I wish, but not yet.

15     Q.   Okay.

16          Well, why is it that the Secret Service is used

17   instead of Metro-Dade?  Is that because of the different --

18     A.   Just basically, you know, we've used Secret Service

19   in the past.

20     Q.   Okay.

21          So, most of the time you guys use the laboratory or

22   forensics of the Secret Service.

23     A.   Yes.

24     Q.   Okay.

25          Did you check to see whether --remember I told you

1    that there were two guns that didn't belong to him.

2        A.   Yes, sir.

3        Q.   Would it surprise you that one belonged to Lucia

4    Calero?

5        A.   No, sir.

6        Q.   Would it surprise you that a Customs agent even had

7    one of the guns?

8        A.   No, sir.

9        Q.   It wouldn't surprise you.

10       A.   No.  It wouldn't surprise me.  I had no information.

11       Q.   You wouldn't be surprised if the gun --if it was the

12   gun of a Customs agent.

13       A.   We all have friends.

14       Q.   Okay.

15            To your knowledge, if there is any --cause, you know,

16   we're dealing with several types of evidence.  We've got

17   testimonial.  We got circumstantial, and we got physical.

18   That's it.  That's the whole ball of wax.

19            The question left here is the physical evidence.  If

20   nothing was found on the computer --we'll deal with the

21   physical evidence.  We know that you have evidence of the use

22   of different names and identifications for different names.

23       A.   Correct.

24       Q.   And we know that you found these weapons.

25       A.   Correct.

43

1      Q.   Okay.

2           Is there any other physical evidence of an

3    incriminatory nature, in this case, physical evidence?

4      A.   I don't know what the reports from the Rape Treatment

5    Center detail.

6      Q.   If the Rape Treatment Center report is negative,

7    aside from the guns and aside from the various different

8    aliases with matching identifications, is there anything else

9    of an incriminatory nature?  When I say that, I mean as to

10   having committed these sexual acts that he's charged with.

11     A.   The only two juveniles that are saying that

12   something --

13     Q.   That's testimonial.

14     A.   Right.  No.

15     Q.   No physical evidence.  Right?

16     A.   No.  No, sir.

17     Q.   Okay.

18          And actually, the guns have nothing to do with the

19   allegations made against this man.

20     A.   No.

21     Q.   Neither does the false identification or aliases.

22   Right?

23     A.   Correct.

24     Q.   Okay.

25     A.   It was just stumbled upon.

1    Q.   Okay.

2       Does your department --you are dealing with the

3 children, now.

4    A.   Yes, sir.

5    Q.   One of then is twelve years old, and the other one is

6 sixteen or seventeen.

7    A.   Something like that.

8    Q.   You don't know whether they got to the police station

9 or not.

10    A.   Right.

11    Q.   Or who took them there.

12    A.   Right.

13    Q.   But I can tell you now it was the early morning

14 hours.  It was like maybe one A.M., and they were there till

15 like 4:30 A.M.  Okay.

16       It is my understanding that the mother of alleged

17 victim J.D., the minor, was there with her mother, okay.  But

18 that there was no adult there with --no adult relatives there

19 for the alleged victim, V.V.

20       Now, is there some policy because they're juveniles,

21 does your police department have some procedure as to make

22 sure that the parents are notified before they start

23 interrogating an alleged victim?

24    A.   We need to contact somebody from the family, yes.

25    Q.   Okay.

45

```
 1            Who do you contact?  In other words, is it the
 2    mother, the father.  That would be the two most likely --
 3        A.   Correct.
 4        Q.   --if they contacted somebody.  So, there is a
 5    procedure of the department to do that.  Right?
 6        A.   Yes, of course.
 7        Q.   Why?  What is the rationale behind that procedure?
 8        A.   Well, number one, it is to have somebody that we
 9    could turn the kids over to afterwards.
10        Q.   Right.
11        A.   You know, the kid is a victim.  The juvenile is a
12    victim of a crime.  So, it is not an interrogation.  We're
13    taking her statement cause she was a victim of an offense.
14            She's claiming the allegations on it.  We will
15    contact a parent, a guardian, grandparent or aunt just to let
16    them know where the juvenile is and the allegations that she's
17    making.
18        Q.   Right.
19            And to be present while they're being interrogated.
20        A.   Not necessarily.  I mean, what we try to do is we try
21    to separate --because sometimes, the juvenile will be, we talk
22    to kids twelve and over.
23            We would never question or take a statement of a
24    child that's under twelve.  That's what the Cristi House is
25    there for.  That's across the street.  It is a child
```

46

1    assessment center.

2          They have forensic interviewers.  They are the ones

3    who interview kids younger than twelve.  But twelve and over,

4    what we try to do is we try to have them alone or make them

5    feel comfortable.  If they have dad or mom, they will clam up.

6    They won't say what is going on.

7          Q.   They don't want to speak in front of them.

8          A.   Right, exactly.

9          Q.   So --

10         A.   But, you know, to answer your question, we will have

11   to notify somebody; yes sir.  And let them know what the

12   allegations are.

13         Q.   Now, if you did try to do that and you contacted and

14   couldn't reach the mother and father, but you contacted, let's

15   say, a grandparent.

16         And the grandparent said, look, I have no authority

17   one way or the other here.  They're not my children.  Would

18   they go over the interrogation of the child?

19         A.   Then, we'll contact the Department of Children and

20   Family, and then, we'll take custody of the child.  We still

21   question the child.

22         Q.   Why do you contact the Department of Children and

23   Family first?

24         A.   Why did we?

25         Q.   Why do you, your procedure?

Official Reporting Services  504 S. Andrews Ave.  Ftl. Fl 33301

47

1    A.   In this type of allegation, where it is either mom or

2   mom's boyfriend, we will always contact the Department of

3   Children and Family and let them know for the child's safety,

4   so the child will not be brought back into that environment.

5    Q.   In this instance, the child was brought back into the

6   environment because she wasn't back with her mother.

7    A.   I have no knowledge of that.

8    Q.   Was the Department of Children and Family called in,

9   this case?

10   A.   I believe so.  They should have.

11   Q.   Nobody in the witness list to that effect.  Do you

12  know who it was?

13   A.   I don't know, sir.

14   Q.   Who would know that?

15   A.   Detective Dominguez will be the detective to ask.

16   Q.   If they were contacted, that would be a violation of

17  the procedure of your department.

18   A.   If they were not?

19   Q.   Yeah, right.

20   A.   If you want to call it that, yeah.

21   Q.   Is that right?

22   A.   Yes.

23   Q.   Okay.

24        So, they were taken over to Christi House, right?

25   A.   Yes.

48

1      Q.   That is right across the street from the State

2  Attorney's Office here.

3      A.   Yes.

4      Q.   Not only is there a psychologist there to question

5  them --

6      A.   That's what I described was twelve and under.

7      Q.   Twelve and over.

8      A.   Twelve to eighteen, we will question them.

9      Q.   Okay.

10          So, in other words, in this case, it was twelve and

11  over.

12      A.   Yes.

13      Q.   So, they weren't taken over to Cristi House.

14      A.   No.  They were taken over to the Rape Treatment

15  Center.  As far as you tell me, that's where the girl was

16  taken.

17      Q.   Well I believe, what happened here was that they were

18  questioned some place before they ever went to a Rape

19  Treatment Center.  Okay?

20      A.   Okay.

21      Q.   No one took them to the Rape Treatment Center from

22  the police department.  Okay?

23      A.   Okay.

24      Q.   The mother took her daughter over there, which was

25  Mrs. DeLaTorre.

49

1    A.   Right.

2    Q.   Okay.

3         So, they should have been taken over.  The police

4    should have gotten them to the Rape Treatment Center.  That's

5    the procedure, right?

6    A.   Unless that the mom said, I'll take the kids over.

7    Q.   But there were two children.  One was not hers.

8    A.   Right.

9    Q.   So, the procedure is to take them over to the Rape

10   Treatment Center.  Correct?

11   A.   Like I said, sir.  I was not the detective in charge.

12   Q.   It has nothing to do with you.  It has to do with

13   your procedure.  That's the procedure.  Correct?

14   A.   The procedure would be, if the girl is claiming any

15   sexual --

16   Q.   As in this case.

17   A.   --allegations, penetration, yes.  They'll be taken

18   over to the Rape Treatment Center.

19   Q.   Okay.

20        Did you know whether there was an allegation of

21   penetration?

22   A.   Like I said, I have no clue.  I have not read the

23   original Offense Incident Report.

24   Q.   Okay.

25        Because as I look at the Rape Treatment Center Report

1   (indicating) of --

2        A.   I think at the bottom (indicating), it says the

3   statement.  The girl gives the doctor a statement.

4        Q.   I'm looking.  It says mother present (indicating).

5   Okay.

6        A.   Right.

7        Q.   And I'm looking to see which one it was.  I know

8   which one it was.  I'm looking to see where it says which one

9   it was (indicating).  They should have a place for a name.

10       A.   Yes.

11       Q.   You don't see it.  Right?

12       A.   No.  It does not --

13       Q.   I mean, I know it is not there (indicating).  Right?

14       A.   I don't see it, no.

15       Q.   But we know since the mother of V.V. was not there,

16   and it says the mother was present, we know for a fact that it

17   was, in effect --the mother they're referring to is Mrs.

18   Senior DeLaTorre.  Oh, here it is (indicating).  Okay, great.

19   It is J.D.  This report (indicating) says that she denied

20   penetration.

21       A.   Okay.

22       Q.   Penetration, denies.

23       A.   Okay.

24       Q.   If she denied it, why was she taken to the Rape

25   Treatment Center?

```
1    A.    She denied to the doctor.

2    Q.    Did she ever say that she was penetrated before she

3  was taken to the Rape Treatment Center?

4    A.    I have no information on that.  Like I said, I wasn't

5  there.

6    Q.    Okay.

7          Do you know what the alleged victim, the minor

8  DeLaTorre, said The Defendant did to her?

9    A.    The only thing was what was said to Mr. Mathew

10 Fisher, at the time of the questioning, when he was brought

11 down to the station.

12         Like I said, I sat in when Detective Dominguez was

13 contacted, and she came over from her house to question The

14 Defendant.

15   Q.    Okay.

16   A.    Which the allegations were that he fondled them, I

17 believe it was.

18   Q.    That's the allegations.

19   A.    Playing with them, fondled them.

20   Q.    You're alluding to what?

21   A.    That he touched.

22   Q.    That he said he touched them.

23   A.    No; that they were saying that he by playing touched

24 their vagina area with his fingers.

25   Q.    Penetrated or touched.  There is a big difference
```

1    there.

2        A.    It is union with an adult with a twelve year old.

3    Just union with.  You don't need penetration.

4        Q.    It would be sexual battery, if it was penetration.

5        A.    Yes; the same with union with.

6        Q.    Right, okay.

7              So, if there was no --what I'm trying to get at is:

8    Did she ever say to anyone, to your knowledge, that she was

9    penetrated?

10       A.    No.  Like I said, I have no information on that.

11       Q.    Do you know what her allegations were aside from the

12   mere touching?  In other words, did she say where it happened?

13       A.    It happened in his apartment.

14       Q.    At The Defendant's apartment.

15       A.    Yes.

16       Q.    Did she tell you that, not necessarily you, but did

17   she say that --if she said it to you let me know, all right.

18   You never talked to her.

19       A.    No.  I don't even know what they looked like.

20       Q.    Isn't it a fact that she said that this occurred at

21   The Defendant's apartment?

22       A.    Right.

23       Q.    And that both alleged victims were there, at the

24   time.

25       A.    Correct.

```
 1    Q.   And that this was the first time and only time that

 2   The Defendant did anything to her, allegedly did anything to

 3   her.

 4    A.   Right.  The information that was passed on to me

 5   before the question was that the twelve year old said she had

 6   stayed over.

 7    Q.   With the permission of her mother.

 8    A.   Right, with the permission of her parent, and that's

 9   when it happened.

10    Q.   Because the other victim is her girlfriend.

11    A.   Correct.  They're friends.

12    Q.   And as a matter of fact, Lucia Calero was there, as

13   well.  Didn't she say that?

14    A.   Yes.

15    Q.   That's The Defendant's girlfriend.

16    A.   Yes.

17    Q.   And the mother of victim, V.V.  Right?

18    A.   Yes, sir.

19    Q.   And didn't she also say --and I'm referring to the

20   young DeLaTorre, the alleged victim -- that when he touched

21   her, he touched her in the shower?

22    A.   That part I --the one that I heard was that she was

23   either laying on the sofa, and he came over, and he put his

24   hand, you know, in her crotch area.

25    Q.   Okay.
```

54

1      If she said he touched her in the shower, that would

2  be inconsistent with it only happened on the couch, right?

3      A.   That's her statement.  Like I said, I didn't take her

4  statement.  I didn't even speak to the victim.  But, if she

5  said it happened somewhere else --

6      Q.   If she said it happened in the shower with her

7  girlfriend there and The Defendant and his girlfriend, who is

8  the mother of V.V., while she's in the shower with the

9  perpetrator, right, if she said that, that would have to be

10  the case.  Right?

11      A.   Like I said, the only thing I know is that the only

12  allegations that were made to me that I knew of on the twelve

13  year old was she was on the sofa, and he came over.  That is

14  the only one that I know.  If something happened in the

15  shower, I have no information on that.

16      Q.   Okay.

17      Do you know that the alleged victim, V.V., has

18  retracted her entire statement?

19      A.   No.

20      Q.   Did you know that she said that the mother of her

21  girlfriend --and I'm talking about the Senior Mrs. DeLaTorres

22  coerced her into making that statemnt in the early morning

23  hours, when they were requested by the police?

24      A.   No, I don't.

25      Q.   Do you know that she also says that not only did she

1    coerce her, but she coerced her only daughter to say that?

2         A.   I have no knowledge of that, no.

3         Q.   Okay.

4              Did you know that I sent her to a psychologist

5    because I wanted an independent opinion, medical opinion, as

6    to whether she was telling the truth or not.

7              And that I've already given the report to the

8    assistant state attorney presiding, in this case, and that

9    doctor says all the tests she gave her are consistent with the

10   truth, i.e. it never happened like she said it did.

11             You didn't know that, did you?

12        A.   No.

13        Q.   Okay.

14             Let's talk about --it is my understanding, and you

15   correct me if I'm wrong, please, okay --that when the kids

16   were down at the police station in the early morning hours

17   being interrogated or questioned, there was a medical person

18   present.  I believe, it was a psychologist.

19        A.   I have no clue.

20        Q.   Would it be unusual for a medical person to be

21   present at the police station, while they're being questioned?

22        A.   Very rare.  Yes, sir.

23        Q.   Okay.

24             What are the instances when they do that, when they

25   have a medical person there?

1       A.    Personally, one year on with the juvenile squad, I

2  have never had that.

3       Q.    I'm not sure that that's correct.   This is

4  information that I received, but from various sources.   I'm

5  not sure that it is correct.   That is what I am trying to find

6  out.

7             If it is, that other doctor should be mentioned on

8  the witness list, and there is only one doctor, Dr. Silva,

9  who's with the Rape Treatment Center, mentioned in the

10  discovery.

11      A.    Right.   Like I said, I have no information on that.

12      Q.    Okay.

13            Is there any physical proof whatever, I am not

14  talking about testimonial, any physical proof whatever, that

15  my client touched these girls sexually?

16      A.    Like I said, I just helped out that day.   I haven't

17  followed the case day by day.   I don't know what type of

18  investigation Detective Dominguez has conducted.

19      Q.    You don't know of any.

20      A.    No.

21      Q.    And would I be fair to say that usually that physical

22  evidence would come if there was some penetration, something

23  from the Rape Treatment Center doctor.

24      A.    Correct, yes.

25      Q.    Okay.

1        And you've already seen the report, in this case,

2   where there is no penetration.

3        A.   That is what the report says.

4        Q.   You can't think of any other physical evidence that

5   would be able to show that he touched the vagina of these

6   girls.

7        A.   No, sir.  The only thing I think that is there is

8   just the statement of the two girls.

9        Q.   So, this zeros down to V.V., who's one of the alleged

10  victims, in this case, has retracted her statement, this all

11  narrows down proof-wise to the statement of the other twelve

12  year old young DeLaTorres, the other alleged victim.  That

13  would be the evidence, in this case.  You can't think of

14  anything else.  Can you?

15       A.   No.  Unless the state attorney has something else to

16  say.  I have no clue.

17       Q.   Okay.

18            Now, the mother, Senior Mrs. DeLaTorres, she's not

19  saying that she saw this happened.  Is she?

20       A.   No.

21       Q.   Okay.

22       A.   I don't think so.

23       Q.   Okay.

24            Now, let me talk about her daughter, the young

25  DeLaTorres.  Did you check her school background?

1    A.    Like I said, sir, I had nothing to do with the

2    victims or investigating what their backgrounds are.

3    Q.    So then, you don't know if she's been disciplined on

4    numerous occasions at school and suspended.  You didn't know

5    that.

6    A.    No, sir.

7    Q.    You didn't know that she took -- she didn't like a

8    teacher, so she took a sharp object and printed some gesture

9    on her car in the paint.  You didn't know that.

10   A.    No, sir.

11   Q.    Did you know that her mother, the Senior Mrs.

12   DeLaTorres, permits a twelve year old girl to go out with

13   seventeen or eighteen year old guys?

14   A.    No.

15   Q.    Did you know she permits her to drink with these

16   guys?

17   A.    No, sir.

18   Q.    Okay.

19        You didn't, really.  No one did.  Any investigation

20   on her background, at all, this child?

21   A.    I didn't do any investigation.  No, sir.

22   Q.    Okay.

23        What is the usually procedure?  Do you do

24   investigations on the alleged victim?

25   A.    We try to find --

59

1       Q.   To see whether they're persons of truth.

2       A.   Correct, yeah.  We try.  That's what we do.

3       Q.   Did anyone try to do that, in this case?

4       A.   I have no clue.  I have no information if they did or

5   not.

6       Q.   Do you know that very night that while they were

7   staying with the mother's, Ms. DeLaTorres' consent at the

8   apartment of The Defendant, in this case, that she was

9   reprimanded by Lucia Calero, the mother of V.V., one of the

10  alleged victims, in this case, because she told her you

11  shouldn't be going out with seventeen or eighteen year old

12  boys.

13       And you shouldn't be drinking with them, and your

14  mother shouldn't be giving you permission to do that.  Did you

15  know that that is what happened?

16       A.   No.

17       Q.   Children can be cruel, can't they?

18       A.   Yeah.  It also opens up another door because there is

19  knowledge that this girl is drinking.  Then, you know, now, I

20  have the obligation to call the Department of Children and

21  Family and report that in, those allegations.

22       Q.   That her mother permits her to do that.

23       A.   Yes, sir.  I'm obligated.

24       Q.   Let's see if I have the name of her boyfriend.  Maybe

25  I can help you out.  I believe, don't quote me on this because

60

1     I'm giving you some general knowledge here.

2          A.    Okay.

3          Q..   I think that the boyfriend's name is Adrianne.

4          A.    This is the girl's boyfriend.

5          Q.    Yeah.  L L A M A S.  Llamas.

6          A.    Okay.

7          Q.    Okay.

8               So, you might want to give him a call.  His number is

9     786-287-5369.  You might want to check that out, now.

10         A.    He's seventeen years of age.

11         Q.    He's seventeen or eighteen.

12         A.    Or eighteen.

13         Q.    Yeah.  Now, I'm not saying he did anything.  He

14    didn't do anything that I know of, okay.

15         A.    You say that there is knowledge that this girl

16    drinks, goes out and drinks with these people, and mom is okay

17    with it.

18         Q.    That's right

19         A.    That consists of child neglect.

20         Q.    A twelve year old going out with a seventeen or

21    eighteen year old.  It is kind of unusual for a mother to let

22    them do that.  Right?

23         A.    My obligation here is I need to report this.

24         Q.    I understand, but, isn't that correct?

25         A.    Yes, most definitely.

1    Q.   Now, why would that be your obligation to do?

2    A.   I'm obligated by The State, such as a doctor is

3  obligated if you see any signs of or the allegations you just

4  made of this twelve year old hanging out with older kids

5  drinking, and mom is okay with it, it constitutes child

6  neglect, possibly, you know, even child abuse, if she's

7  putting her in danger.

8    Q.   Okay.

9         Did you know that when Lucia Calero told her that her

10  mother shouldn't be letting her do those things that she took

11  offense to that?  You didn't know that.

12    A.   No, sir.

13    Q.   Okay.

14         This is interesting.  There is a person mentioned who

15  did a police report here, but he's not on the witness list

16  supplied to me by The State cause I'm looking at a report

17  (indicating).

18         It says reporting officer M. Pena.  Is he involved in

19  this case?

20    A.   I have no clue unless he was the original officer

21  that took the report.

22    Q.   Let's see what it says.  Did she tell you --well, she

23  didn't tell you anything.  You never spoke to her.

24    A.   No, sir.

25    Q.   She says that --in this report (indicating), it says

1  that the young DeLaTorres, the twelve year old says that The

2  Defendant forced her to take a pill, okay.

3        Now, was any forensic examination done on this girl

4  to see whether she had any substance, I mean, drug in her

5  system?

6     A.   No.   The only thing I would tell you is once she was

7  taken to the Rape Treatment Center that they will pull blood,

8  if you mention that.   I don't know if they did pull blood or

9  not.   We can submit it to the lab.

10    Q.   Okay.

11         We're talking about someone who was involved, in this

12  case.   Officer Pena.

13    A.   Yes.

14    Q.   Okay.

15         Do you know Officer Pena?

16    A.   No clue.

17    Q.   He's with --let's see if he's with your department.

18  Take a look at this (indicating).   You see where he put his

19  name here.

20    A.   Right.

21    Q.   Is there anything in there that --

22    A.   He's with us.   I could tell you his I.D. is 730.

23  He's probably a fairly new officer.   Probably, on field

24  training, right now.   He rides with a senior officer.

25    Q.   So, he's with the City of Miami Beach Police

1   Department.

2       A.   Yes.

3       Q.   By the way, these two alleged victims, did they give

4   taped statements or stenographically recorded statements or

5   written statements or what?

6       A.   Like I said, it is either taped statements --like I

7   said, I have no information what they gave --or written.

8       Q.   Okay.   Right.

9       A.   Either taped or written statements.   We usually work

10  more with the taped because it is their voice on the tape.

11  Just knowing how Detective Dominguez works, I will probably

12  bet that she did take taped statements.

13      Q.   Okay.

14           Who were the persons that did the searching of The

15  Defendant's apartment?

16      A.   The five of us went in.

17      Q.   You didn't search, you didn't open drawers or

18  anything.   Right?

19      A.   No, sir.

20      Q.   Did you go into the bedroom where he said the guns

21  and the identification were or did somebody else?

22      A.   When we called I.D. for pictures, our I.D. tech when

23  he went in or I don't know if it was a female, I don't know

24  who it was.   It was a female.   Like I said, I walked in and

25  everything was spread out on the bed.

1        That's where she was taking pictures of it, but I

2   didn't search for --I didn't go through any drawers or

3   anything like that.

4      Q.   So, photos were taken at the scene, at the time of

5   the arrest.

6      A.   Yes.

7      Q.   Okay.

8      A.   Of the items that were to be taken, which was the

9   guns.

10     Q.   Of anything that was taken.

11     A.   Correct.  All the items that were taken.

12     Q.   Okay.

13          Did you personally search the bedroom?

14     A.   No, sir.

15     Q.   So, it was one of the other four or it was some of

16   the other four.

17     A.   I stood because it was my handcuffs on this

18   gentleman, and I just stood next to him talking to him.

19     Q.   And where was Lucia Calero, at the time of the

20   search?

21     A.   She was brought out, and she was sitting also in the

22   living room.

23     Q.   She was not on the balcony.

24     A.   At one point, I think, she asked to smoke a

25   cigarette, I think.  I know that she walked outside with a

65

```
 1  cigarette with Sergeant Gullage, and she walked outside.   I
 2  believe it was, she wanted to smoke a cigarette.
 3       Q.   Nobody ordered her out there.
 4       A.   No.
 5       Q.   Okay.
 6            And for part of this search, she was actually --it
 7  was done in her view.  She was in the apartment.
 8       A.   Yes.  She was laying in bed.  She was awakened.  She
 9  was taken to the living room.
10       Q.   Right.
11            And if there was any searching done any place else,
12  she would have seen it, right?
13       A.   I would say yes, if she was there.
14       Q.   Okay.
15            Do you know of any information that any part of that
16  house was searched?  I'm not talking about the computer.
17  Other than the bedroom and the bedroom closet --
18       A.   No.  I think the only thing was that The Defendant or
19  your client asked for a Coca Cola soda and --
20       Q.   From the refrigerator.
21       A.   Yeah, exactly.  We got him the soda.
22       Q.   So then, you did not see anyone.  You were in the
23  living room.
24       A.   Yes.
25       Q.   And you did not see any search occur in the living
```

66

1    room.

2        A.    No.

3        Q.    Or any place else, other than the bedroom or the

4    bedroom closet.

5        A.    No, sir.

6        Q.    When he comes to the door, okay, from that time until

7    he gets to the police station and is mirandized,

8    okay --because you said he wasn't taped until he was

9    Mirandized.

10       A.    Right.

11       Q.    From the time when he first answered the door and

12   until he is Mirandized, did he say anything of an

13   incriminatory nature?

14       A.    No.  He did say lots of names.  I mean, he just

15   started naming --

16       Q.    His aliases.

17       A.    No.  Meaning, people that he knows.

18       Q.    Richard DeGregory.

19       A.    I said, okay.  Everything will be verified, you know.

20   We'll call everybody.

21       Q.    But nothing of an incriminatory nature, other than

22   perhaps incriminatory because he has social security cards of

23   other people, right?  Nothing that incriminates him sexually,

24   in this case.

25       A.    No.

1    Q.   Okay.

2    A.   He didn't say anything.  He didn't make any

3  statements.

4    Q.   Okay.

5         Now, were you there when he gave his sworn statement?

6    A.   Yes.

7    Q.   Okay.

8         Was it taped?

9    A.   Yes, sir.

10   Q.   Okay.

11        Did he deny the allegations made against him?

12   A.   Yes, sir.

13   Q.   Did he ever say anything that would incriminate him,

14  regarding the charges filed against him, in this case, the

15  sexual allegations?

16   A.   He denied all allegations made against him by the

17  kids.

18   Q.   He never said anything which would lead you to

19  believe that he was saying anything, other than denial.

20   A.   The only thing that he made the statement that he

21  made that really caught my attention, he said on several

22  occasions the sixteen year old female will try to grab his

23  penis.

24   Q.   Is that on the statement?

25   A.   Yes, sir.  Tried to pull his shorts down, once in the

1  beach, I think and once in the apartment.  I remember the one

2  at the beach.

3       That she will try to pull down his shorts and try to

4  grab his penis.  And I said, was it in a sexual manner that

5  she tried doing that?  He really couldn't answer.

6     Q.   This is on the beach.

7     A.   In the water.

8     Q.   Okay.

9     A.   She will play rough with him.  On occasions, try to

10 pull his shorts down and try to grab his penis.

11    Q.   I mean, did he actually try to grab his penis?

12    A.   Yes.  I even said, you know, the word, try to grab

13 your dick, we're talking, and he said, yes.

14    Q.   Okay.

15         In public.

16    A.   They were in the water, but there were people around.

17    Q.   Okay.

18         Do you know back background of V.V., who was supposed

19 to have done that?

20    A.   No, sir.

21    Q.   Okay.

22         Do you know what time he signed the Miranda Form?

23    A.   No.  It will be documented.  I mean, it will be, I

24 think, next to the signature, if it is.

25    Q.   It is documented.

```
 1      A.   Okay.

 2      Q.   I have it here.

 3      A.   Okay.  I have no recollection.

 4      Q.   The tape of his statement or anybody's statement,

 5 does it have a time on it?

 6      A.   She'll say --she said the beginning time and the

 7 ending time of the tape, before we talk to you or before we

 8 talk to The Defendant, you know.

 9      Q.   You'll say it.

10      A.   Yes.  We'll say, you know --

11      Q.   It is not automatic print like they have on a

12 photograph.

13      A.   No, sir.

14      Q.   Okay.

15           So, it should say time began, time ended.  That's the

16 procedure.

17      A.   Correct, yes.

18      Q.   Okay.

19           And so, I don't know that this is the case.  I

20 haven't even gotten the tape yet of The Defendant's statement,

21 okay.

22      A.   Correct.

23      Q.   But if this is an example, this Miranda Warnings Form

24 (indicating) says the time is 12:55 P.M.

25      A.   Okay.
```

70

```
 1        Q.   Then, the time said on the tape should be thereafter.

 2        A.   It should be, yes.

 3        Q.   Okay.

 4        A.   Now, that is the miranda, when it was --

 5        Q.   I'm looking.

 6        A.   It should be afterwards.  Yes, sir.

 7        Q.   Am I correct to say that when anything is seized from

 8   a person's apartment who is in custody or arrested, okay, that

 9   he gets an inventory list so that he knows he has proof of

10   what the police took from his apartment?

11        A.   We do a property receipt.  We document it.  But is

12   there anything given to him?

13        Q.   Yeah.  I mean in every case that I've ever been

14   involved in, a property receipt is given to The Defendant, so

15   that he can claim his property later, and so no one can say,

16   we didn't take that.  If it is on the list, you have to make

17   sure it is a complete list.

18        A.   Right.

19        Q.   Is that the procedure of your department?

20        A.   Something voluntary.  The computer was taken

21   voluntarily.  He signed off on the computer.  I think, we gave

22   him a copy of that.  Everything else was just impounded as

23   safekeeping.

24        Q.   How do you then --and not to say that anybody would

25   do that.  I'm not saying that.  Let's say somebody likes
```

1   something that was there and took it, like five hundred bucks

2   that was taken from The Defendant, okay, as part of this, and

3   somebody took this, how would he ever be able to prove,

4   without a property receipt, saying that is what they took that

5   he lost five hundred dollars?

6       A.   He could report a theft happened.  Then, it would be

7   investigated.

8       Q.   I'm not talking about that.  I'm actually talking

9   about actual proof.  If you arrested me and took five hundred

10  bucks and you give me a property receipt, and then, the money

11  is not there, you are the one who's going to be responsible.

12      A.   Right.

13      Q.   Does your department have a procedure whereby they do

14  that?

15      A.   I'm just thinking that I don't think that he was

16  given anything, no.

17      Q.   Am I correct to say that's the procedure of your

18  department?

19      A.   I am just thinking, if it is on paper or not.

20      Q.   I'll tell you what.  I've got property receipts.

21  They don't say five hundred dollars, and he had five hundred

22  bucks on him.

23      A.   On him, on his person.

24      Q.   Either on his person or in his apartment, five

25  hundred bucks.  He had just gotten it from an ATM machine.  I

1   can prove that.

2      A.   Okay.

3      Q.   Cause he has receipts, all right.  So, the question

4   is:  What happened to the five hundred dollars?  That is not

5   an accusation against anybody.

6      A.   Right.

7      Q.   Okay.

8           I don't know.

9      A.   I have no information on that.

10     Q.   All right.

11          Now, the five hundred dollars, what significance does

12   that have to this case?  No one said he paid them to touch

13   them.  What does the five hundred dollars have to do with this

14   case?

15     A.   Sir, for the record, right now, the only thing I can

16   tell you is I have no information on five hundred dollars

17   until you just brought it up.  I have no clue.

18     Q.   Would it be correct to say there is of no evidentiary

19   significance, in this case, at all?

20     A.   No, sir.

21     Q.   He should get that back now.

22     A.   If it is, if he claims it.  If not, he's going to

23   have to file a police report.

24     Q.   Now, I'm looking at the discovery sent to me by the

25   state attorney.  There is a list.

1        A.    Okay.

2        Q.    Not the list of discovery.  The list of what they

3   have that I should have.  It says, there has been electronic

4   surveillance.  Do you know of any electronic surveillance, in

5   this case?

6        A.    No.

7        Q.    That means to me somebody's phone is bugged or

8   something of an electronic nature that's seeking evidence of

9   some sort.

10       A.    Right.

11       Q.    I think this is a mistake, okay.  But do you know of

12  any electronic surveillance, in this case?

13       A.    No, sir.

14       Q.    Was his phone ever bugged?

15       A.    No.

16       A.    I have no knowledge.  Not from us.  We would know

17  about it.

18       Q.    Was his apartment bugged?

19       A.    No, sir.

20       Q.    Okay.

21             So, as far as your understanding, there is no

22  electronic surveillance.  You'd be surprised to hear that.

23       A.    Yes, sir.

24       Q.    It says there was a search and seizure and the

25  documents relating there to may be copied.  You have said

74

1    there was no search warrant.  So, there was a search and

2    seizure.

3        A.   Yes.

4        Q.   But this says that there are search and seizure

5    documents.  That's not correct, is it?

6        A.   The only thing I can think of is the computer.  If

7    something is found like what we talked about before, that is

8    the only thing that I will infer to.

9        Q.   But electronic surveillance is not a computer.  That

10   is getting a computer and its drive and checking what is on

11   there.

12       A.   Right.

13       Q.   As far as you know, there is no electronic

14   surveillance.

15       A.   Not that I'm aware.

16       Q.   As far as you know, there was never a search warrant.

17       A.   No, sir.

18       Q.   Okay.

19            It also says there are no statements of experts and

20   yet, it mentions Dr. Silla.  He's a doctor.  He's an expert.

21       A.   Yes, sir.

22       Q.   So, that's a mistake.

23       A.   That's not from us.

24       Q.   No.  This is from the State Attorneys Office.  This

25   is from the State Attorney.

75

1    A.   All right.

2    Q.   That's an error, as far as you know --

3    A.   I don't know how they work, but yeah.  You have a

4  professional, a doctor that does a report that examines the

5  victim.

6    Q.   He'd be an expert.

7    A.   I would say so, yes.

8    Q.   Okay.

9         Now, this says all physical evidence known to the

10  state, at this time, not obtained from or belonging to the

11  accused.  Do you know if I can go down there and copy these

12  things?

13        Do you know of anything that you have, in this case

14  of a physical nature, physical evidence that did not belong to

15  or not obtain from The Defendant?

16    A.   No.

17    Q.   Okay.

18        Do you know if there is any fingerprint evidence?

19    A.   No.  I don't have that information.

20    Q.   You are not aware of any.

21    A.   No.

22    Q.   Okay.

23        It is said in the Arrest Affidavit (indicating) of

24  Officer Dominguez that my client not only touched these girls,

25  but that he touched their clothing.

1     Now, as you are aware, I'm sure if you're not, let me

2  know, when you perspire that can be DNA evidence, okay.   And

3  certainly, if they found DNA evidence on the clothing of these

4  girls, it would somewhat support their story.

5     Do you know if there is any DNA evidence, in this

6  case?

7     A.   No.   I don't even know.   We usually include the

8  clothing, and I don't know if it was collected from the girls.

9     Q.   Okay.

10     And so, you know, of no DNA evidence, in this case.

11     A.   No, sir.

12     Q.   And no swabs were taken of my client, were there, so

13  that they would have --

14     A.   I remember that he was fingerprinted, photgraphed,

15  but I don't remember the swabs.

16     Q.   Okay.

17     Have you ever listened to the tapes of these girls?

18     A.   No, sir.

19     Q.   Okay.

20     Let me ask you a question.   By the way, if V.V., one

21  of the victims in this case, made a report to the police, and

22  then, she retracted that statement later, she would have filed

23  a false police report.

24     A.   Yes, sir.

25     Q.   She would have obstructed justice.

1    A.   Yes, sir.

2    Q.   She would have interfered with a police

3 investigation.

4    A.   Yes.

5    Q.   All chargeable offenses.

6    A.   Yes, sir.

7    Q.   Okay.

8         Now, I'm reading from one of the statutes that my

9 client was charged with, okay.  To be specific 794.05.  It

10 says unlawful sexual activity with certain minors, person 24

11 years of age or older, who engages in sexual activity with a

12 person sixteen or seventeen years of age with a person sixteen

13 or seventeen years of age commits a felony of the second

14 degree punishable by such and such as used in this section.

15 Sexual activity means oral, anal or vaginal penetration or

16 union with the sexual organ of another.

17    A.   Right.

18    Q.   Now, do you know what the case law says about what is

19 union with?

20    A.   I know of --I probably read it.  I have no

21 recollection on it, right now.  I know what it means for union

22 with.

23    Q.   If I just touch a vagina, I don't try to penetrate

24 nothing, I just touch it, okay.  Is that what you consider

25 union with or are we talking about union with my penis?

1    A.   No, just any physical union with.

2    Q.   Any touching.

3    A.   Yes.

4    Q.   Any touching.

5    A.   Yes.  Your tongue, your lips, your fingers.  Yes,

6 sir.

7    Q.   Okay.

8         He's then charged with Florida statute 800.034, which

9 is entitled lewd or lascivious offenses, section five, and

10 that section reads anyone who intently touches the genital

11 area or the clothing covering them.  Okay.  That would be the

12 crime.

13    A.   Right.

14    Q.   All right.

15         Now, if he I'm wrestling with a young lady, and I

16 happen to brush her, you know, not intentionally trying to

17 touch her vagina, that wouldn't fit within that category

18 because there is no intent.

19    A.   Yes.  That is the main word, the intent.

20    Q.   It is the intent.

21    A.   Yes, sir.

22    Q.   Then, it goes on to paragraph B (indicating).  Well,

23 the rest is not important.  It just deals with age as opposed

24 to punishment.  Okay.

25    A.   Right.  Yes, sir.

1    Q.   Okay.

2         Now, I'm looking at a report (indicating).  Can you

3    tell me, this says confidential unathorized releases a law

4    violation Florida Protective Services System?  Okay.  I've got

5    ask you a question.  Who's the author of this?

6    A.   That is the Department of Children and Family Report

7    (indicating).

8    Q.   Does it say who did this report (indicating)?

9    A.   It will tell you.  That's the supervisor, and that's

10   the investigator who authored the report.

11   Q.   Now, what this says, and they're referring to -- I'm

12   going to read you the highlighted part.  For the past two

13   years, Carl, referring to The Defendant, has been molesting

14   V.V., fondled her breasts and touched her vagina, followed

15   V.V. into the shower and molested her there.

16        The incident occurred at Carl's home, when mom and

17   V.V. were visiting.  So allegedly, I would have to assume that

18   this is what V.V. told this person who did this report

19   (indiating).  Okay.

20   A.   Right.

21   Q.   And what she's saying is that his girlfriend was

22   present, when he was in the shower with her daughter.

23   A.   That's what it says.

24   Q.   You didn't even know that, did you?

25   A.   No.

80

1    Q.    Okay.

2    A.    I'm trying to read here who called.  Does it who

3  called?

4    Q.    You mean, who said it.

5    A.    Yes.

6    Q.    It says V.V. said.

7    A.    No.  Who called the Division of Children and Family

8  and made that allegation?

9    Q.    I don't know.  That could be the mother of the other

10  girl.

11    A.    5 a.m.  That is when this was generated (indicating).

12    Q.    Right.

13          You've seen these before.

14    A.    Yes, sir.

15    Q.    Okay.

16    A.    I'm just trying to see who called it in.

17    Q.    I'd like to know that myself.

18    A.    You have the date, the time; cause they could have

19  been, you know, the allegations that were made by the child

20  that when the police officer, who called all of them, had to

21  say the allegations, like the one that I'm going to report

22  today, you know, I'm going to have to put your name on there.

23    Q.    I am not worried about it.  I've been given this

24  information.

25    A.    You are doing the right thing.

1      Q.    I don't think I'm violating any law.

2      A.    No, of course not.  I'm just trying to see if it

3  says --

4      Q.    Would it normally say who?

5      A.    It should say it on top.  It would say Miami Beach

6  police officer, and then --

7      Q.    But it doesn't.

8      A.    It does not.

9      Q.    Let me ask you this:  What comes first, this or the

10  police report?  I'm not talking about the time that they're

11  written.  I am talking about the time the information is

12  given.  Is it first to the Department of Children and Family

13  or is it to the police first, and then --

14      A.    Well, we have it both ways.  We have had it where the

15  Department of Children and Family refers cases to us.  Hey,

16  you know, they'll come up, and they'll say, a week ago this

17  happened on Miami Beach.

18      Q.    But this didn't happen, in this case.

19      A.    No.  This case what happened was it was reported.

20  That part, I didn't know that the girl was brought to the

21  police station by mom along with the sixteen year old, and

22  they made the allegations there at the police station.

23      Q.    Which one came first is what I'm concerned with?

24  Does it tell you the time?

25      A.    Yeah.  The time, if you have the Offense Incident

1    Report --

2        Q.    Yeah.

3        A.    1:41.

4        Q.    Do you have the Offense Incident Report, the original

5    report?

6        Q.    I am sure we can find it, but look at Penas.

7        A.    Right.  That probably is the Offense Incident Report.

8        Q.    Is that Pena's report?

9        A.    You don't have the front.

10       Q.    It says the same day.

11       A.    Right.  You don't have the front page to it.

12       Q.    That's all I got.  I have this.  That's not the front

13   page.

14       A.    The front page will have, you know, the time.   I

15   could tell you probably it was, more or less, this report, the

16   police report, and then, the DCF report.

17       Q.    Okay.

18            Now, not only is the person who allegedly made this

19   statement, I don't doubt if she did, if they say that she did,

20   that's V.V., this is the same girl that retracted everything.

21   Keep that in mind.

22            When I reiterate that she never mentioned anything

23   about a shower in the shower, while her mother is in the

24   apartment, nothing about that in the report.  She gives it to

25   the police.  Now, that's something unusual, having a shower

1  with the woman's boyfriend, while she's in the apartment.

2  Would you agree?

3      A.   Yes.

4      Q.   So, would you agree that it certainly is something

5  that you would think would be in the police report, which was

6  taken first?

7      A.   The only thing I could say, if she didn't mention it,

8  then all you have is contradicting testimony.

9      Q.   Contradicting testimony, right?

10     A.   Yes.

11     Q.   Okay.

12          Of an important nature.

13     A.   Most definitely.

14     Q.   Okay.

15          Off the record.

16                    (Off the record discussion.)

17  BY MR. GURALNICK:

18     Q.   Officer, when the night that the --or the day or

19  night that The Defendant was --let me ask you this:  What time

20  was he at the police station that night?

21     A.   In the morning.

22     Q.   In the morning?

23     A.   In the morning.

24     Q.   When he was there.

25     A.   Yes.

1    Q.   Okay.

2         There were two lawyers that actually were there also

3    downstairs that were his lawyers.

4    A.   At the lobby.  Yes, sir.

5    Q.   And did anybody tell --this is before his statement

6    was taken.

7    A.   Yes, sir.

8    Q.   The Defendant.

9    A.   Yes.

10   Q.   Before his statement was taken, did anybody advise

11   him that the lawyer swere there?

12   A.   Yes, I did.

13   Q.   And did anyone ask him if he wanted to speak to his

14   lawyer before he gave a statement?

15   A.   Yes, sir.

16   Q.   What was his response?

17   A.   That he didn't need one.

18   Q.   He didn't need one.

19   A.   No.

20   Q.   Okay.

21   A.   I even personally brought --I went downstairs to the

22   attorneys.  I brought him their cards, and he said, I don't

23   need them.

24   Q.   Okay.

25   A.   He also afterwards met with them, after the

1    statement.  We, you know, brought up the two attorneys, and

2    let them talk to him.

3        Q.   Okay.

4            I'm looking at a piece of evidence that was given to

5    me by the state attorney, which is entitled control packet

6    (indicating).  Okay, at the bottom it says comments

7    (indicating).

8            And I believe this is the comment of the state

9    attorney who wrote it.  I say that because we have had

10   different state attorneys on this case already because they

11   get bounced around the State Attorneys Office.

12           It says, I'm going to read this the best I can

13   (indicating).  What I am reading is actually here, but there

14   are some words I can't make out.

15           I'm going to read to you what I can read, okay.  It

16   says, victim DeLaTorres, this is the other girl now, not the

17   one that retracted her statement.

18       A.   The twelve year old.

19       Q.   Right.

20           Indicated that she was improperly touched on her

21   something area -- we can assume what that is --by The

22   Defendant on 7-19-02.  However, on 7-19-02 and she also said

23   that she also said something about the unlawful activity to

24   victim two, okay, which would be V.V.

25           All right.  Victim two V.V. however, at prefile, she

1    was there with her mother and her attorney.  That's the

2    attorney for the child, not for the mother, okay.

3         She was there with an attorney.  Therefore, the

4    history of sexual abuse on the part as to victim V.V. has not

5    been charged.

6         So, somebody decided not to charge, and then,

7    somebody decided to charge because now, there is an

8    Information filed naming her as a victim.  Okay.

9         Have you ever seen that before?

10   A.   No, sir.

11   Q.   So, you don't know who did it, right?

12   A.   No, sir.

13   Q.   You wouldn't know.  Okay.  Was there an ASA present

14   when these children were giving their statements --

15   A.   Not that I know of.

16   Q.   --or when The Defendant was giving his statement?

17   A.   No.

18   Q.   Okay.

19        Do you know, whether or not, DeLaTorres Senior, the

20   mother, had permission to bring the daughter of Lucia Calero,

21   who's V.V., to the police station at that early morning hour?

22   A.   No clue.  I'm not aware.

23   Q.   Okay.

24        A cell phone was taken from my client from his

25   apartment, at the time he was taken into custody.  Does it

1    have any bearing on this case?

2        A.    No.  I don't know exactly what was taken from him.

3        Q.    Did you know that the Guiding Light is a soap opera?

4        A.    The Guiding Light.

5        Q.    Everybody knows that one.

6        A.    Yes.

7        Q.    And that approximately two weeks before, on that

8    show, they acted out the very same story?

9        A.    I have no clue, no.

10       Q.    Okay.

11             Did you know that these kids watch that show?

12       A.    No, sir.

13       Q.    Now, that I informed you of the disciplinary problems

14   that the young DeLaTorres has at school, do you think that it

15   would be the police thing to do to check out her school

16   records to see if she's lied before?

17       A.    I would probably look into t.  I don't know if

18   Detective Dominguez has looked into it or not.

19       Q.    Would you advise Detective Dominguez of what I said

20   because that way, he can make a decision as to whether he

21   wants to do that?

22       A.    I'll advised her.  Yes, sir.

23       Q.    All right.

24             Did you know that the alleged victim, young

25   DeLaTorres, had spent many nights at The Defendant's apartment

1    and has never made an accusation over nine years, and that she

2    never said that he tried to do this to her on any other of

3    those prior occasions?

4        A.    No, sir.  I wasn't aware of that.

5        Q.    Okay.

6        A.    Like I stated before, I never made any contact with

7    the victim or the reporting person.  I only dealt with your

8    client.

9        Q.    Well certainly, that would be a valuable piece of

10   information.

11       A.    Yes.  Most definitely, yes.

12       Q.    Okay.

13             You may want to check this out, the information that

14   I gave you, because my client has a boyfriend.  I'm sorry.

15   The daughter of the girlfriend of my client has a boyfriend,

16   and I have a name, but I'm not sure cause I don't want anyone

17   to be accused wrongfully.  Okay.

18       A.    Okay.

19       Q.    I gave you the name of --

20       A.    Adrianne Llamas.

21       Q.    Right.

22             But, there is another name I have here (indicating),

23   and I don't have any information written.  I wasn't sure

24   whether this was another of her or the boyfriend that I was

25   telling you about and his name, I'm going to give it to you.

89

1    It is Lugi Giovanni Rodriguez.

2        A.   Now, this is the sixteen year old boyfriend.

3        Q.   Is that the case?  Is that the case?  Cause then that

4    will take care of that.  That is the sixteen year old

5    boyfriend.

6        A.   No.  I don't have no information.

7        Q.   I'm talking about the twelve year old.

8        A.   Right.  The twelve year old, you said --

9        Q.   It is and/or this guy.

10       A.   And or.

11       Q.   I'm not sure whether it is the first one I gave you

12   or this one, okay?

13       A.   All right.

14       Q.   I think I was right the first time, but I just want

15   to give you all of the information, so you have it.

16       A.   All right.

17       Q.   Okay.

18            There is something else I wanted to ask you.  On the

19   Arrest Form of Officer Dominguez, I have the original copy,

20   and there is no check on the bottom portion of it, which says

21   hold for bond hearing.

22       A.   Okay.

23       Q.   But when I look at another --this is the original

24   copy.

25       A.   Okay.

1      Q.   When I look at what is a copy of a copy, same report

2  exactly, word for word, even the words are in the same place,

3  that's the same copy.

4      A.   Right.

5      Q.   It says hold for bond.  There is a check.  Why is

6  that?

7      A.   I have never checked that box (indicating).  We don't

8  check that box.  It could either Corrections, when he was

9  brought in for processing.

10     Q.   Yeah, but it is an affidavit.

11     A.   Right.

12     Q.   Is this sworn to?

13     A.   No.  That's the sergeant's signature.

14     Q.   I'm going to show you both.  See the same signature

15  blank check.  Can you explain that?

16     A.   I have never checked out that box.  We don't check

17  out that box.

18     Q.   Okay.

19          Who would do it?

20     A.   Like I said, that would be Corrections.  That could

21  be.

22     Q.   But this is sworn to.

23     A.   Right.  You know, he swore.  The sergeant here swears

24  to the information, the crime and the elements of the crime.

25     Q.   Okay.

1          Because, you know, in my experience, and I'm

2   not --believe me, I'm not faulting most police officers

3   because if they're not there, we are in the jungle.  Okay?

4        A.   Okay.

5        Q.   But there are lawyers that shouldn't be practicing

6   law.  There are police officers that shouldn't be police

7   officers.  We all know that, in anything.  All right.

8        A.   Yes, sir.

9        Q.   But I have had the personal experience on numerous

10  occasions, where a police officer just wants the guy held

11  longer, and so, he checks off that hold for bond hearing.  And

12  then, he can't bond out like any other normal person can.

13       A.   Right.

14       Q.   Okay.

15          This is a bondable offense.  Even the judge, the

16  magistrate who presided at the bond hearing, says this is a

17  bondable offense.  Why was this checked off.  You don't know.

18       A.   No.  We didn't do it.

19       Q.   But certainly, on a bondable offense, and I mean,

20  there is no reason to check that block off, is there?

21       A.   Like I said, I never checked that box off.  In my

22  nine and a half years, I've never --the only thing I could

23  tell you, my part with your client, and he was treated very

24  fair, he was given the opportunity of a lawyer, including

25  after the fact, he wanted to speak to his lawyer.  We brought

1  both lawyers up.

2         So, I don't think he should have any complaints in

3  that sense from us.  But that box, like I said, I have never

4  checked it off.  I doubt he was in our custody.  That could

5  have been Corrections.  That could have been ordered by --

6     Q.   Does Corrections have the authority to --

7     A.   They are the ones.

8     Q.    --put something on a police report?

9     A.   I have no clue how they work.  I have no clue how

10  they work.  I don't even know how much the bond would be.

11    Q.   Okay.

12    A.   Cause we don't look into that.

13    Q.   Okay.

14         I remember I told you about the name.  I now have the

15  answer.

16    A.   Okay.

17    Q.   The first name I gave was Adrianne Llamas.  That is

18  not the one because he's the boyfriend of V.V.

19    A.   Okay.

20    Q.   So, its got to be the other one.

21    A.   Lugi.

22    Q.   Yeah.

23    A.   You don't know how old.

24    Q.   I believe, he's seventeen or eighteen years old.

25    A.   Okay, great.

1    Q.   Okay.

2    A.   He has knowledge of her drinking.

3    Q.   Drinking, yeah.  You know, there may be something I

4  don't know about, too.

5    A.   I'm just trying to get the facts right.  So, alcohol

6  with the boyfriend who's seventeen or eighteen years old and

7  mom has knowledge and let's her.

8    Q.   That's what I have been told.

9    A.   Okay.

10   Q.   There is a second name that might also be a

11 boyfriend.  His name is Rubio.

12   A.   Rubio.  Is that the first name?

13   Q.   It sounds like it could be a nickname.

14   A.   Okay.

15   Q.   I also have this information that the alleged victim,

16 DeLaTorres, is a gang member of the gang called the Psychos.

17   A.   DeLatorre you said, right?

18       MR. GURALNICK:  Yeah.  That's the end of the

19       deposition.  I don't have any further questions.

20

21       (Thereupon, the deposition was concluded.)

22       (Reading and signing were not waived.)

23

24

25

```
 1

 2                                    _____

 3                                         Deponent

 4

 5          Sworn to and Subscribed before me on this

 6   _____day of _____, 2002.

 7

 8                                    _____

 9                                        Notary Public

10                 REPORTER'S DEPOSITION CERTIFICATE

11   STATE OF FLORIDA:
     COUNTY OF DADE:
12
                   I, LOURDES M. RESTREPO, certify that I was
13   authorized to and did stenographically report the foregoing
     deposition, pages 1 to and including 93, and that the
14   transcript is a true record of the testimony given by the
     witness, DETECTIVE RIGOBERTO OLIVERA.
15
                   I further certify that I am not a relative,
16   employee, attorney, or counsel of any of the parties, nor am I
     a relative or employee of any of the parties' attorney or
17   counsel connected with the action, nor am I financially
     interested in the action.
18
        Dated this 2nd day of October, 2002.
19

20   _____

         LOURDES M. RESTREPO, Court Reporter
21

22                        Lourdes Rodriguez-Restrepo
                          My Commission CC807052
23                        Expires March 11 2003

24

25
```

1

```
 1              IN THE CIRCUIT COURT OF THE 11TH
                JUDICIAL CIRCUIT IN AND FOR
 2              MIAMI-DADE COUNTY, FLORIDA

 3              CASE NO: F02-22910

 4   THE STATE OF FLORIDA,

 5        Plaintiff,

 6   vs.

 7   CARL MARCIANO a/k/a
     MATTHEW FISHER a/k/a
 8   SEAN MERRICK a/k/a
     PAUL BOOKER,

 9
          Defendant.
10
     _____
11

12

13

14              Public Defender's Office
                1320 N.W. 14th Street
15              Miami, Florida  33125
                Wednesday, January 22nd, 2003
16              10:20 A.M.

17

18

19       DEPOSITION OF DETECTIVE IVETTE DOMINGUEZ

20       Taken before Sylvia Evans, Notary Public for the

21   State of Florida at Large, pursuant to Notice of Taking

22   Deposition filed in the above cause.

23

24

25
```

COURT EXHIBIT
02-20857
CASE CR-Seitz
NO.

EXHIBIT 2
NO.

1

2

3

4

5

6

7              A P P E A R A N C E S

8       NO APPEARANCE
        On behalf of Plaintiff.
9
        DAVID ROTHMAN, ESQ.
10      THORNTON & ROTHMAN, P.A.
        2860 First Union Financial Center
11      200 South Biscayne Boulevard
        Miami, Florida  33131
12      On behalf of Defendant.

13

14

15

16                    I N D E X

17   Witness                                      Page

18   DETECTIVE IVETTE DOMINGUEZ          Direct. . . 3

19

20

21

22

23

24

25

```
 1   Thereupon;
 2                   DETECTIVE IVETTE DOMINGUEZ
 3   was called as a Witness and having been duly sworn, was
 4   examined and testified as follows:
 5                   DIRECT EXAMINATION
 6   BY MR. ROTHMAN:
 7        Q.   You want to state your full name and by whom
 8   you are employed for the record, please?
 9        A.   Ivette Dominguez, Miami Beach Police
10   Department.
11        Q.   Do me a favor and give me a brief background
12   on your experience, employment as a police officer,
13   etcetera.
14        A.   I have been with Miami Beach Police
15   Department for four years now.  In the Detective Bureau
16   a little over a year.  Previous to that, I had worked
17   with Metro-Dade Police Department for approximately
18   seven and a half years, the last three years in the
19   Detective Bureau, General Investigations Unit.
20        Q.   Any reason you made the change?  Any reason
21   you care to discuss?  Just out of curiosity.
22        A.   No.  I stayed home with my daughter for three
23   and a half years in between.
24        Q.   What unit are you with now?
25        A.   Juvenile Investigations Unit.
```

1     Q.    What does that entail normally, what types of

2  crimes do you investigate?

3     A.    Missing persons, any crimes against

4  juveniles.

5     Q.    Pretty broad.  So it could be any case where

6  the allegations would involve a crime against a child

7  like a robbery, could be a rape, could be molestation,

8  could be almost anything if it involves a child?

9     A.    Could be a theft, yes.

10     Q.    So any of the categories of crimes, if it

11  involves a minor, may come to you or could not?

12     A.    And elderly also, yes, crimes against the

13  elderly.

14     Q.    How did you come to be involved in this

15  particular case involving -- I will call him Mr. Fisher

16  because his real name is Matthew Fisher.  I think he

17  was arrested under Carl Marciano, unless you have a

18  preference.

19     A.    It doesn't matter.

20     Q.    How did you come to be involved in this

21  particular case involving Mr. Fisher?

22     A.    I was called in by the communications

23  supervisor August 1st.

24     Q.    And what event triggered that?

25     A.    She advised that there were uniformed

1    officers taking a report of a sexual battery on minors.

2         Q.   At the station?

3         A.   At the police station.

4         Q.   What did you do when you learned this

5    information?

6         A.   I was asked to respond to the station and I

7    did.

8         Q.   And the call was relating to a sexual battery

9    on minors, that's how it came out, or the notification

10   to you was of a sexual battery on minors?

11        A.   Or allegations of such.

12        Q.   Do you remember about what time you got that

13   call?

14        A.   No, I do not.

15        Q.   Was it in the morning, afternoon?

16        A.   Oh, no, it was late at night.  It was at

17   eleven o'clock at night, I think.

18        Q.   You got to the station.  What did you do when

19   you got to the station?

20        A.   I met with the uniformed police officers,

21   Officer Pena and Officer Barrera.

22        Q.   What did they tell you?

23        A.   They advised me what they had been told,

24   provided a copy of the Offense-Incident Report.

25        Q.   Did they tell you anything different than

1    what was indicated on the Offense-Incident Report, do

2    you recall?

3         A.   No, they gave me a brief synopsis of what was

4    on the report.

5         Q.   Did you make any notes with regard to the

6    conversation or your review of the O.I. at that point?

7         A.   Did I make notes as far as what they were

8    telling me?

9         Q.   What they were telling you, what you saw on

10   the O.I.?

11        A.   No, I was reading it as they were telling me.

12        Q.   Did you ultimately prepare a report in this

13   case?

14        A.   Yes, I did.

15        Q.   I don't think I've got that.  Could I see

16   that?

17        A.   (Indicating.)

18        Q.   May I read it?

19        A.   Sure.

20             (Discussion off the record.)

21             MR. ROTHMAN:

22        Q.   I assume you will be referring to that during

23   your deposition periodically?

24        A.   Yes.

25        Q.   If you would, if there are things that you

1   can testify to without referring to it, that's okay if

2   you need to refer to it, certainly you have a right to

3   do that.   Just let me know when you are doing that.

4   And if you need a break, I know you have a terrible

5   headache, just let me know and we will do what we can.

6           I have reviewed the supplemental report that

7   you prepared.   What date did you prepare that report?

8       A.   I started it August 5th.

9       Q.   When you say "started it," it's an ongoing

10  report?

11      A.   Right.

12      Q.   As you gather information, you add it to the

13  report?

14      A.   Right.

15      Q.   Does it get dictated one time or do you do it

16  handwritten first or add to it as you go along?

17      A.   No, I don't dictate at all.

18      Q.   You type your own report?

19      A.   Yes, Sir.

20      Q.   So everything there that is on that report

21  was done by you as you received the information?

22      A.   Correct, or from notes.

23      Q.   Do you keep your notes?

24      A.   Some notes we do.   Specifically, I have like

25  dates and times I contacted people and things of that

1  nature.

2       Q.   And that's contained in your file?

3       A.   Yes.  We call it case activity log, so I keep

4  handwritten notes as to who I have called and what kind

5  of things I did.

6       Q.   What's your first entry on that particular

7  log?

8       A.   Paged by -- I was beeped.

9       Q.   So it began with the beginning of your

10  involvement in this case?

11       A.   Correct.

12       Q.   Do you have a notation on there as to the

13  exact time or do you remember independently the exact

14  time you met with any of the individuals involved as

15  either victims, suspects or witnesses in this case?

16       A.   I actually have times -- I don't normally

17  keep times but in this case I wrote down times under

18  there.  Ten minutes after midnight I met with the

19  officers, twenty minutes after midnight I spoke with

20  Ms. Queija, Y.D.'s mother, Q-U-E-I-J-A.  At about one

21  o'clock in the morning I interviewed Y.D.  About 2:05

22  a.m. I interviewed V.V.

23       Q.   Did Y.D.'s mother speak English or Spanish or

24  both?

25       A.   English.

1    Q.   So after speaking with the officers, then the

2  next person you spoke to, according to your notes --

3  which I assume were at or about the time of the meeting

4  that you had with the individuals -- you spoke with

5  the mother of the child?

6    A.   Correct.

7    Q.   And from her you obtained some information

8  about what the general allegations were and what the

9  daughter had told the mother?

10    A.   Correct.

11    Q.   Could you summarize what the mother told

12  you?  I'm going to get a copy of the report

13  eventually.  You did a very nice job of breaking down

14  the statements so it will be helpful.  But I'm assuming

15  that that's statements made by the mother in response

16  to questions you asked.  Would that be an accurate

17  assessment?  In other words, the notes that you have

18  that were turned into a report would be written in

19  statement form about what the mother said.  Would you

20  be asking her questions to get the information or was

21  she giving you a narrative, do you remember?

22    A.   Specifically, I probably asked her, "Tell me

23  what's going on.  Give me some family history," things

24  of that nature.  I might have asked her how long she's

25  known them or if she knew an exact date when the

1  incident occurred.

2      Q.    If you could, would you read that part of

3  your report now that relates to the interview of the

4  mother and let me know if there is anything else that

5  you remember in addition to that?

6      A.    I used initials because of the juvenile

7  confidentiality.  Y.D. goes to school with V.V.  Y.D.

8  was --

9      Q.    Well, what we can do with this is we leave

10  the initials in.  You can use the full name but we

11  leave the initials in.  I only want to make sure that

12  we understand who we are talking about.  The alleged

13  victim, the twelve-year-old alleged victim, is Y.D.?

14      A.    Y.D.

15      Q.    And the sixteen-year-old --

16      A.    Is V.V.

17      Q.    -- alleged victim who turns out to be the --

18      A.    Girlfriend's daughter.

19      Q.    The stepdaughter now because they are

20  married.  But girlfriend.  Would be the daughter of Mr.

21  Fisher's girlfriend.  And the other one there was an

22  A.V. also?

23      A.    A.V. would be the boy.

24      Q.    And he's the son of Mr. Fisher's girlfriend?

25      A.    Correct.

1    Q.    Any other initials we need?  I think that's

2  it, right?

3    A.    I think those were it.

4    Q.    So the mother told you that Y.D. --

5    A.    The two girls go to school together.

6    Q.    Well, they are very different in age, one is

7  twelve and one is sixteen, almost seventeen years old?

8    A.    I understand.  They go to the same school.

9         She stated that her daughter, Y.D., was

10  invited by Luisa, who is the other victim's mother, to

11  visit and stay at the suspect's apartment.  She said

12  that Luisa had been dating the suspect for

13  approximately three years and often stays at his

14  apartment.

15         She stated his name is Carl Marciano but he

16  also has a name of Matthew Jack Fisher.  She said that

17  he has two names because he's a retired N.Y.P.D.

18  undercover police officer and needed to protect himself

19  against the people he arrested.

20         She stated that her daughter told her that

21  while visiting at the suspect's apartment with V.V. --

22  it was either one or two weeks prior, she couldn't give

23  me exact dates, she was confused as to what date the

24  child went over and what date she returned, it was one

25  or two weeks prior -- the suspect had touched Y.D. next

1   to her genitals.

2       Q.   Your notes which I read through -- your

3   report said "next to her genitals."

4       A.   Correct.

5       Q.   When I try and visualize that, I'm not sure

6   what that means.  What does "next to genitals" mean?

7   Did she specify?  Did she show you?  Did you understand

8   that to mean something?

9       A.   This is what she told me.  At some point the

10  girl did indicate to me.

11      Q.   But she was not more specific than that,

12  "next to her genitals"?

13      A.   Next to her genitals, her genital area, I

14  can't recall if she was more specific.  At this point

15  it's hearsay because this is what her daughter told

16  her.

17          That Y.D. also told her that on one occasion,

18  while V.V. had gone into the bathroom, the suspect went

19  inside and locked the door.  That V.V. started

20  screaming and later told Y.D. that the suspect had

21  touched her.  That on the same date -- that Y.D. told

22  her that the same day she had the incident with the

23  suspect, the suspect had given her, V.V. and A.V., a

24  small blue pill and she fell asleep.

25          The mother then requested to have Y.D.

1   examined at the Rape Treatment Center, at which time

2   she was referred because it was a one or two-week later

3   incident, so we don't normally call and make the

4   appointment.  She calls, makes the appointment and she

5   brings her in herself.  And I advised her she had a

6   right to take her and have her examined if that's how

7   she felt.  And that was the extent of the interview

8   with the mom.

9       Q.  Did you ask the mother why on August 1st they

10  were there at the police station at night reporting

11  something that had occurred a week or two earlier?

12      A.  I don't have in my notes having asked the

13  mother.  I do believe I did ask the child.

14      Q.  Because it seems to me that that would

15  certainly, under those circumstances, be a logical

16  question.  People show up at the police department at

17  night to complain about what appears to be an alleged

18  lewd and lascivious assault that occurred a week or two

19  before and there seems to be some kind of an issue

20  there as to who delayed or why the report was made

21  late, whether there was a delay after the report was

22  made.  You don't remember her saying or explaining --

23      A.  I don't have anything in my notes indicating

24  that I asked the mother.  I do believe I asked the

25  daughter.

1    Q.   What was the mother's demeanor when she was

2    explaining this to you?

3    A.   She was calm.   Slightly upset, but she was

4    calm, concerned.

5    Q.   Who did she say she came to the police

6    department with?

7    A.   The mother?

8    Q.   Yes.

9    A.   I believe she came with her boyfriend.   She

10   had a guy with her, she had her daughter and there were

11   quite a few other kids there, a bunch.   They were like

12   hanging out in the front lobby of the station.   In

13   general, they said they came together but there were so

14   many people, they came in several cars.   I couldn't

15   tell who was riding with who in what car.

16   Q.   When the mother told you this, was she alone

17   with you?

18   A.   Yes.

19   Q.   Somewhere in your office, I guess?

20   A.   She was in my office alone.

21   Q.   Had you yet met either of the two alleged

22   victims?

23   A.   No.

24   Q.   So after you spoke with the mother, you then

25   spoke with Y.D.?

```
1        A.    Her daughter, Y.D.

2        Q.    How old is Y.D.?

3        A.    Twelve.

4        Q.    Did she appear to be a twelve-year-old to

5   you?  You have children, right?

6        A.    Yes.

7        Q.    How old are your kids?

8        A.    Too young.

9        Q.    You have teenage kids, young?

10       A.    No, young.

11       Q.    Did she appear to be a twelve-year-old to

12  you?

13       A.    Nowadays it's hard to tell.  I deal with

14  juveniles on a daily basis and there are

15  twelve-year-olds that look like they are fifteen or

16  sixteen and there are twelve-year-olds that look

17  younger.

18       Q.    Do those two girls look familiar

19  (indicating)?

20       A.    Yeah, this (indicating), I believe, is the

21  sixteen-year-old.

22       Q.    In the red shirt is V.V.

23       A.    However, the twelve-year-old did not look

24  like that.

25            (Discussion off the record.)
```

1          MR. ROTHMAN:

2     Q.   So you then met with Y.D. and you spoke with

3  her.

4     A.   Yes.

5     Q.   Did you do like an interview off the record

6  first or off the tape and then tape it or did you go

7  right on the tape and tape whatever she said?

8     A.   No, I interview her off the tape first.  I

9  talk to her, find out what she's got to say and

10 everything else.  Which is where my synopsis comes

11 from.  My notes on the report are not specifically

12 everything she said on tape because sometimes it

13 changes from what she tells you to what she finally

14 says at the end.

15    Q.   So what you have in your report would be your

16 notes from what she told you before she was recorded,

17 since what she said on the tape is on the tape and that

18 speaks for itself?

19    A.   Correct, correct.  But it's almost -- it's a

20 brief synopsis because basically it's supposed to be

21 about the same.  Sometimes they leave one thing off of

22 one and then --

23    Q.   Sometimes more than one thing.

24    A.   It changes.

25    Q.   How did she appear to you in terms of her

1    demeanor and her maturity?

2         A.   She appeared very mature for her age.

3         Q.   In general, when you were discussing this

4    incident, did she appear to be -- it's always hard to

5    judge other people's children but you have been a

6    police officer a long time -- did she appear to be a

7    little more sophisticated than she should be at twelve

8    years old?  I mean sophisticated in terms that she had

9    some knowledge about relationships or sexual activity

10   that was unusual for a twelve-year-old?

11        A.   We didn't go into too much details about

12   sexual activity and things like that so I couldn't tell

13   you about that.

14        Q.   Was she comfortable talking to you?  You seem

15   to be a soft person to talk to, maybe because you have

16   a headache.  But some people are easy to talk to and

17   some are not.  My guess is you like kids?

18        A.   Well, it's part of the job.  It doesn't

19   matter if they like you or not.

20        Q.   I think you get a lot more out of them if

21   they like you -- that's a bad choice of words --

22   trust.  You probably develop trust with these kids and

23   that's how you get them to communicate with you.

24        A.   It's hard in cases of this nature.  They do

25   get embarrassed, shy, and they don't want to tell you.

1    But they know they have to but they try to tap dance

2    around it and not tell you specifics.

3         Q.    Tell me what she told you.  If you want to go

4    through that in terms of your interview of her before

5    you went on the record or if you want to tell me

6    without reviewing, because I have listened to the tape

7    and I have read the transcript so I know what she said

8    there and we don't have to discuss that.  But I'm more

9    curious of your interview with her off the tape.

10        A.    She stated she had known V.V. since Pre-K,

11   that V.V.'s mother Luisa has been with the suspect for

12   about three years, that she had stayed overnight at the

13   suspect's apartment with V.V. and her family because

14   she had been invited to visit.

15             That on the specific incident date between

16   eleven p.m. and one a.m., she was lying down on the

17   couch watching T.V.  She said she had like two sheets

18   covering her.  She said she was wearing a gray Mickey

19   Mouse shirt, knee-length shorts.  She stated the

20   suspect sat against her on the couch and that he

21   stated, "Should I do this today instead of doing it

22   tomorrow?"  She states she told him, "No," and that he

23   reached under the sheets.

24             That at some point V.V. and her brother,

25   A.V., turned around to see what was going on and that

1   the suspect told them, "Watch T.V.  This is none of

2   your business.  It's between me and her."  That he

3   reached inside her shorts with one hand, that she was

4   squirming and trying to get his hand away from her.

5   That he pushed her knees aside and that he rubbed her

6   groin area.  I believe at that point what she was doing

7   is she was indicating here (indicating).

8        Q.   The inside upper thigh?

9        A.   Inside upper thigh area.

10        Q.   Now, you are showing me her right hand on her

11   right thigh?

12        A.   I couldn't tell you which.

13        Q.   But I want to make sure that you are as

14   specific as you can be but not overly specific.  But

15   you recall her taking one of her own hands and touching

16   the inner top part of her thigh, either right or left?

17        A.   Correct, up to like the crease where the leg

18   bends by the groin area.  She then said he touched the

19   exterior of her vaginal area with his index finger and

20   she kept going like this (indicating).

21        Q.   Using her index finger, pointing?

22        A.   She was pointing with her index finger and

23   kept saying that he was tapping her.  I probably asked

24   her if she was wearing panties because it didn't make

25   sense he's reaching in your shorts but he's touching

1  your vaginal area.  And she said she was wearing

2  panties but she had a wedgie so the panties were kind

3  of moved to the side, if you know what a wedgie is.

4  She said her panties were kind of moved to the side, I

5  guess exposing part of her vaginal area.

6       Q.   But she used the word "wedgie"?

7       A.   She used the word "wedgie."

8            She said that V.V.'s mother was sleeping

9  because she had taken some medication.  That Mr. Fisher

10  had been playfully tickling her that day, that she had

11  seen him tickling V.V. and A.V. in the past.  She

12  indicated V.V. tries to pull his shorts down.

13       Q.   Her friend, V.V., the sixteen-year-old, she

14  said tries to pull down Mr. Fisher's shorts?

15       A.   Shorts, correct, sometimes.

16            She stated that on the Sunday, he had touched

17  V.V. two times in the same way.  She claims that V.V.

18  was getting towels in the bathroom and he went in the

19  bathroom with her and closed the door and V.V. started

20  screaming, "Mom.  Mom."

21            At some point -- she didn't go into anymore

22  specifics about that specific incident -- she said he

23  made food for them and asked them if they were sleepy

24  and then eventually he gave all of them a blue pill and

25  said it was a sleeping pill.  She said she swallowed it

1    because he was standing right there in front of her and

2    she was intimidated so she just swallowed it.  She said

3    V.V. pretended to take hers but then she threw it away

4    and V.V.'s brother held his against his lip.

5         Q.    Indicating that he did or did not swallow it?

6         A.    She didn't know.

7         Q.    How would she know he held it against his

8    lip?

9         A.    I guess they had discussed it, I don't know.

10             The suspect then went in his room.  She

11   eventually fell asleep and woke up at approximately ten

12   a.m. the next day.  She told V.V. what had happened to

13   her and V.V. advised her it had happened to her too.

14   She first told her father what had happened, then

15   eventually her mother.  She said that she and V.V.

16   disclosed the incident to V.V.'s grandmother, who is

17   Ms. Bocanegra, and also to V.V.'s mother who was

18   Luisa.  That Luisa began crying and hugging V.V. and

19   stated that if it happened again, she would report it

20   to the police.  That Luisa stated she didn't want to

21   report it now because she was scared that when the

22   suspect got out of jail, he would send people to kill

23   her.

24        Q.    This is what Y.D. is telling you that V.V.

25   told her that Luisa told V.V.?

1      A.   Well, no, she is stating that she and V.V.

2 disclosed them both to the grandmother and to the

3 mother.

4      Q.   So what you are quoting there, as far as you

5 understood, was something that Y.D. heard Luisa or --

6      A.   Or saw.

7      Q.   Or saw Luisa say and do?

8      A.   She hugged her daughter and cried.

9      Q.   Is that the sum and substance of the notes

10 you made regarding the statement --

11      A.   Correct.

12      Q.   -- pre-tape that Y.D. gave to you?

13      A.   Correct.  Now, it doesn't state in here but I

14 remember specifically she said that the reason why

15 there was a lapse in time between the report was she

16 told her father first.  She waited a few days and then

17 she told her father.

18      Q.   Why did she wait a few days?

19      A.   I don't know.

20      Q.   Did you ask her?

21      A.   She said she waited a few days, she told her

22 father and then eventually she told her mother,

23 probably about a week after that.  And then the father

24 was trying to find out Mr. Fisher's real information or

25 he wanted to talk to some people he knew that were cops

1   to find out what he should do to proceed with it or

2   something like that and therefore, that was the lapse

3   in the one or two-week period before they reported it.

4       Q.   That's what Y.D. said to you, that there was

5   a lapse between when it happened and when she told her

6   father.  Did she say that she told her father before or

7   after that incident where Luisa hugged V.V. and told

8   her --

9       A.   She didn't tell me.

10      Q.   Did she tell her father this while she was

11  still staying with Luisa at Mr. Fisher's or did she

12  tell her father --

13      A.   No, it was after they had returned, after she

14  was home.

15      Q.   So chronologically then, if Luisa hugged

16  V.V., it would have been while she was still there.  So

17  the sequence would have had to have been first tell

18  V.V., then V.V. tells the grandmother --

19      A.   Grandmother is not at Mr. Fisher's house.

20  Grandmother lives in Miami somewhere.  It was my

21  understanding that she goes home and after she is home,

22  she mentions it to her father.  Subsequently, she

23  mentions it to her mother.

24      Q.   But her father and mother don't live

25  together.

1    A.   Exactly.  But she told her father first.

2  Eventually she tells her mother.  And then they went to

3  V.V.'s grandmother's house, Ms. Bocanegra's house, and

4  that's when they told everybody else.

5    Q.   What day did this happen?  What day did the

6  supposed unlawful touching actually happen?

7    A.   She couldn't tell me the specific date.  She

8  were confused of what day she had gone because there

9  was a lapse in time.  They weren't sure if it was that

10  weekend or the weekend prior.  They were trying to

11  figure out -- her mother -- I also sat her down with a

12  calendar and she said she's not sure if she went on

13  Thursday with them and came home on that Sunday or

14  Monday or if it was the week after.  They couldn't tell

15  me specifically.  They knew it was a weekend.  It was a

16  couple of weeks prior, one to two weeks prior to the

17  date that they were reporting the incident.  The child

18  did the same thing when I tried to ask her and pinpoint

19  specific dates and times, she had a problem remembering

20  which weekend it was that she had been there.

21    Q.   August 1st, when they came to see you, was

22  what day of the week?

23    August 1st is a Thursday.  So she was talking

24  about it happened either July 26th, 27th, 28th would be

25  the weekend before, or July 19th, 20th, 21st.  Are

1  those the two weekends?

2      A.   I couldn't pinpoint them.  They couldn't

3  remember if she had gone to stay with them -- because

4  it was summertime -- on a Wednesday or Thursday and

5  then spent the weekend.  They just knew it was one or

6  two weeks prior but they couldn't specifically -- but

7  that sounds about right, the same time span that we

8  were trying to figure out which weekend it had

9  happened.

10     Q.   I can understand that the mother wouldn't

11 know.  But did you find it unusual that something that

12 happened within seven to fourteen days, the daughter

13 couldn't even pinpoint within a week?  In other words,

14 she couldn't say it happened six days ago or thirteen

15 days ago?

16     A.   No, because she had stayed there for a few

17 days in a row.  So she was having a problem which days

18 exactly she went to stay with them, which day exactly

19 the incident occurred.  She had stayed over a period of

20 time, over a few days.

21     Q.   Well, according to what they told you, she

22 stayed there how many days at Mr. Fisher's apartment?

23     A.   They didn't tell me exactly, Sir.

24     Q.   Did the daughter tell you how long she was

25 there?

1     A.   They couldn't remember.  I couldn't get them

2  to pinpoint.

3     Q.   Not the date, the number of days?

4     A.   Exactly, I couldn't get them to pinpoint

5  because they couldn't remember, not the mother, not

6  her.  They couldn't remember if she stayed from

7  Wednesday to Monday or went on Thursday and came home

8  Sunday.  They couldn't tell me specifically which day

9  of the week the child went to stay there and which day

10  of the week she came back.

11     By the same token, because there was a lapse

12  in time, they couldn't tell me exactly which week it

13  was.  Believe me, I spent a lot of time trying to

14  pinpoint exact dates and times as to when she went to

15  stay there and when the alleged incident occurred and

16  could not get them to specify exactly.

17     Q.   Or even within a week?

18     A.   It was still a one to two-week period before

19  they reported it.

20     Q.   Well, we don't know that, though.

21     A.   Approximately.

22     Q.   It could be three weeks from the incident to

23  when it was reported.

24     A.   It could be.  But at that specific time, they

25  were stuck between one and two weeks.

1    Q.   Did you find it unusual the mother wouldn't

2    know when her daughter was staying with somebody else,

3    what weekend it was, what week it was?   Did you find

4    that unusual?

5    A.   Not specifically, because apparently they are

6    pretty close and she does spend a lot of time with the

7    other family.

8    Q.   Do you know whether she spent a lot of time

9    with the family at another house also during the same

10   period of time?

11   A.   No.

12   Q.   The information I have been able to ascertain

13   is that the daughter was basically allowed to stay with

14   Luisa and/or Matthew for a period of over two weeks,

15   almost three weeks, and it wasn't a couple of days.

16   Did the mother ever mention that to you, that she

17   hadn't seen her daughter in like three weeks, over a

18   three-week period of time that the daughter was with

19   Luisa and Matthew or Luisa or Matthew during those

20   three weeks?

21   A.   No, she did not.

22   Q.   Who is the very first person that Y.D. told

23   you she told about this?   Who did she say was the first

24   person she told?

25   A.   V.V.

```
 1        Q.    What about who is the very first person

 2   outside the family that she told, not V.V., not Luisa,

 3   not Ms. Bocanegra?

 4        A.    No, she said she told V.V. and then her

 5   father.

 6        Q.    So the very next person she told was her

 7   father?

 8        A.    She didn't tell me she had told anybody

 9   else.  She could have but she didn't tell me that.

10        Q.    Did she tell you how long she waited between

11   the incident and telling her father?

12        A.    No, she did not.

13        Q.    Did you ask her?

14        A.    I don't have it in my notes but I believe I

15   did and it was again the issue of when she stayed, how

16   long she stayed.

17             (A brief interruption.)

18             MR. ROTHMAN:

19        Q.    Did you ever speak with the father?

20        A.    No, I did not.

21        Q.    Would that have helped you to perhaps

22   pinpoint a little bit better when it occurred, since he

23   was the first one that was told?

24        A.    Possibly.

25        Q.    Did she tell you what she told her father?
```

1      A.   No, she did not.

2      Q.   You know what she told her mother, at least

3  the mother told you what she told her since you spoke

4  with the mother.  So we are really not sure what day or

5  date this occurred but we know it happened sometime in

6  July.

7      A.   I believe so.

8      Q.   Correct?

9      A.   Yes.

10      Q.   August 1st would have been -- it had to have

11  been in July then?

12      A.   Correct.

13      Q.   And we know where it occurred would have been

14  the apartment in Miami Beach Mr. Fisher used to rent,

15  correct?

16      A.   That's what she indicated.

17      Q.   And where within the apartment did it take

18  place?

19      A.   She said it was the living area where they

20  had the couch.  She was on the couch and they were

21  watching T.V.

22      Q.   And she said this in her statement to you,

23  that there were other people present when the unlawful

24  touching took place?

25      A.   Correct.

1    Q.   And it was V.V. and A.V., the brother and

2    sister who were Luisa's children?

3    A.   Correct.

4    Q.   What did she say she said if anything at the

5    time Mr. Fisher was supposedly touching her the two

6    times he touched her?  Two times I'm saying because one

7    time was the upper thigh, the other time was around her

8    vaginal area with his index finger.

9    A.   I think it was all around.

10   Q.   A continuous touching?

11   A.   A continuous type of thing.  He was there and

12   from there he was poking, that's the impression she

13   gave me.

14   Q.   What did she say she said, if anything,

15   during this time?

16   A.   She said she was just pushing him away and

17   squirming.

18   Q.   She didn't say, "Stop," or "Help," or

19   "Don't," or anything like that?

20   A.   No.

21   Q.   You mentioned that supposedly Mr. Fisher

22   asked her a question and she answered him before the

23   touching.  Do you have it in those notes?  Because you

24   have a specific question that he asked her and she had

25   answered.

1     A.   Correct.

2     Q.   Could you repeat that for me, please?

3     A.   "Should I do this today instead of doing it

4  tomorrow?"

5     Q.   Did she explain to you what that meant, what

6  she thought it meant?

7     A.   No.

8     Q.   And she said she answered it.

9     A.   Yes, she said she told him, "No."

10    Q.   What did she mean?

11    A.   She didn't know what he meant.

12    Q.   But she answered him, "No"?

13    A.   Correct.

14    Q.   And she said he had earlier tickled her?

15    A.   Correct.

16    Q.   Did she say when that occurred vis-a-vis when

17  this unlawful touching took place?

18    A.   No.  During the course of the day he had been

19  tickling her.

20    Q.   And where did the tickling take place in

21  terms of where within Miami Beach someplace?  Was it in

22  the apartment, outside, did she say?

23    A.   I didn't go into specifics on that.

24    Q.   Did she say what part of her body he tickled?

25    A.   No.

1      Q.   Did she say that she thought there was

2  anything improper about the tickling?

3      A.   No.

4      Q.   She said to you in the statement that she

5  noticed that V.V. and A.V. were looking at her while

6  this was happening and that Mr. Fisher said something

7  to them apparently?

8      A.   She said they turned around to see what was

9  going on.

10     Q.   And she could see that they turned around to

11 look at what was going on?

12     A.   She said they turned around.

13     Q.   Did she say what the lighting was like in the

14 room?

15     A.   No, she said the T.V. was on.

16     Q.   She didn't say whether the lights were on or

17 off?

18     A.   No, I don't recall.

19     Q.   It's obvious she could see them because she

20 could see them turn around looking at her.  Did she

21 tell you where in the room they were supposedly lying

22 down or standing up?

23     A.   I don't have that in my notes.  I can't

24 recall.  It might be on the taped statement portion of

25 it.

1    Q.   So as far as that statement goes that you

2  have there, the oral statement she made that was not

3  recorded, what we do know from that is that what

4  happened happened within plain view of two other

5  individuals, A.V. and V.V., that they would have seen

6  part or all of what was occurring if they were looking

7  at it?

8    A.   Not necessarily.  She said she was covered in

9  sheets and that he was reaching in under the sheets.

10   Q.   Well, did she say whether she was giggling or

11 laughing or anything like that, like she was being

12 tickled?

13   A.   No, she said she was just squirming, trying

14 to get him away.

15   Q.   Where was she when this happened?  Was she on

16 a chair, a couch, a bed?

17   A.   She said she was laying on the couch -- lying

18 on the couch, watching T.V.

19   Q.   Did she tell you what time this occurred?

20   A.   Yes, I told you, eleven p.m. to one a.m.

21   Q.   So it was within that time period but she's

22 not sure exactly within that time period what time it

23 occurred?

24   A.   Correct.

25   Q.   Did she say what she was watching on T.V.?

1      A.    No, she did not.

2      Q.    Do you know whether or not she's ever accused

3  anybody else of doing this?  Did you ask her that

4  question?

5      A.    No, I did not.  I don't recall having asked

6  her.

7      Q.    And when you interviewed her, did you know

8  anything about her background, anything about her

9  school or how she was doing in school, her reputation

10  for veracity, anything like that?

11     A.    No.

12     Q.    Did you ask the mother about that, about her

13  general character for being truthful?

14     A.    No.

15     Q.    Obviously there would be no physical evidence

16  here.  A touching that occurred a week or two weeks

17  earlier the way she described it wouldn't leave any

18  kind of physical --

19     A.    No penetration.  She was not alleging any

20  penetration.  So not that I would know of.

21     Q.    So going to the Rape Treatment Center at that

22  point is, after the fact, of no value whatsoever

23  because there would be nothing to demonstrate?

24     A.    No, it didn't show me anything.

25     Q.    So aside from her describing to you what she

1    described to you, are you aware of -- up to this point,

2    you haven't talked to V.V. yet.  Are you aware of any

3    other proof that this even occurred?

4         A.   No.

5         Q.   So you have a twelve-year-old's statement of

6    what occurred and you have done the work up to that

7    point.  After you take her statement, did you tape her

8    statement or did you take another verbal from V.V.

9    before taping Y.D.'s statement?

10        A.   No, I took her taped statement.

11        Q.   So you stayed with her, did the preinterview

12   interview and then you interviewed her again on the

13   tape?

14        A.   Correct.

15        Q.   And when you finished with that, what was the

16   next thing you did?

17        A.   I went downstairs and got V.V.

18        Q.   And you interviewed V.V.?

19        A.   Correct.

20        Q.   And what did she tell you about Y.D., about

21   what supposedly happened to Y.D.?

22        A.   I can jump through all these other things,

23   right?

24        Q.   Take your time.

25        A.   I'm sorry.  It's coming out of context, out

1  of order.

2          She stated a couple of weeks ago, Y.D. was

3  visiting and while watching T.V., the suspect touched

4  her.

5      Q.   Did she say that she saw it or that Y.D. told

6  her it happened?

7      A.   This is what she would have seen.

8      Q.   Are you sure?

9      A.   She told me that she had been told and then

10  she said this is what happened.  She said Y.D. was

11  lying on the couch covered and that the suspect was

12  sitting alongside of her and Y.D. was kicking the

13  suspect.

14      Q.   She said that Y.D. was kicking Mr. Fisher?

15      A.   (Witness nodded.)

16      Q.   Which is different than what Y.D. said.

17      A.   Right, but that's up to interpretation.  She

18  could think she's kicking and she's just squirming.

19  The other one could say she's squirming and she is

20  actually trying to push him away with the feet.  But

21  yes, they said it different.  V.V. and her brother

22  turned to see what was going on and the suspect said,

23  "Watch the T.V.  This is Y.D. and my business."

24      Q.   And did she turn away?

25      A.   Yes.  She said they both turned away.

```
1        Q.   So she saw her, Y.D., squirming or kicking --
2   I think was the word she used -- and then she was told
3   to turn away?
4        A.   Correct.
5        Q.   So during the time that Y.D. was squirming or
6   kicking, she said that she and her brother were
7   watching and then were told by Mr. Fisher to turn away,
8   which she did.  Did she say her brother did also?
9        A.   She said they turned away.
10       Q.   Did she give you a better day as to when this
11  happened?
12       A.   No.  Again, it was the issue of the exact
13  day.  She said a couple of weeks, she couldn't tell me
14  the exact date.
15       Q.   She said a couple of weeks but she didn't say
16  it was either a week or two weeks ago, she was more
17  firm on it being more distant?
18       A.   A couple of weeks.
19       Q.   Well, a couple means two usually.
20            Did you ask her what, if anything, she knew
21  about Y.D. in terms of her veracity?
22       A.   No, not as far as her veracity is concerned.
23       Q.   And you asked her other questions about her,
24  what happened to her and she told you some things about
25  that which is in your report which we can get later.
```

```
 1    I'm not frankly as concerned about that since the

 2    charges at this point don't really relate to her.  I'm

 3    more concerned with the charges that relate to Y.D.

 4         A.   Correct.

 5         Q.   After you interviewed her and made those

 6    notes, you then took a taped statement from V.V.,

 7    correct?

 8         A.   Correct.

 9         Q.   Now, before you interviewed V.V., did you get

10    any parental authority to do that?

11         A.   No, I did not.

12         Q.   In your report you note that you spoke with

13    an Assistant State Attorney about that and got the

14    prosecutor's authorization to go forward without

15    parental consent?

16         A.   Correct.

17         Q.   And you mentioned in the report that it was

18    your decision not to contact Luisa because Luisa was

19    with Mr. Fisher?

20         A.   Correct.

21         Q.   And that would reveal what's going on with

22    the investigation and, of course, that would not be

23    something that would be acceptable at that point, for

24    obvious reasons?

25         A.   Correct.
```

1    Q.   Did V.V. have a father, do you know?

2    A.   I believe he's not in the picture.

3    Q.   What does that mean?

4    A.   He hasn't been around.

5    Q.   How do you know that?

6    A.   Off the top of my head, I recall talking

7    about it but I don't have it documented anywhere.   I

8    may be wrong but I believe that's what I remember.

9    Q.   What about another relative, someone that you

10   could have contacted?  Did you ask her about that, of

11   anybody else that was some kind of relationship, close

12   relationship with her?

13   A.   No, just the grandmother.

14   Q.   Did you think about getting a Child Advocate

15   to be present for the interview?

16   A.   Yes, we did.  But at that point we had

17   contacted an Assistant State Attorney who said we

18   didn't need anybody.

19   Q.   Are you aware -- and my guess is you would be

20   since you do this type of work -- that when juveniles

21   are involved, they are entitled to counsel, either as

22   victims or as witnesses?

23   A.   Yes.

24   Q.   As a matter of fact, on cases a lot of times

25   when I represent someone charged in a case, I will get

1    these notifications that a lawyer has been appointed to
2    represent the child's interests and I have to deal with
3    that individual as opposed to going through a subpoena
4    process.  Did you make any efforts whatsoever to have a
5    temporary appointment of either a guardian or guardian
6    ad litem or counsel for her before doing anything?
7         A.   No.  We had spoken to the Assistant State
8    Attorney who said we didn't need that.
9         Q.   You went the right route in terms of the
10   prosecutor.  Frankly, I'm not sure myself what the
11   entirely proper method of proceeding is under those
12   circumstances.  These are very unusual circumstances.
13        A.   She originally had indicated that she had
14   told her grandmother she was coming to the police
15   department to file the police report and that her
16   grandmother was too tired and was afraid of driving at
17   night.  So the grandmother didn't want to come.  I
18   tried calling the grandmother, the phone got picked up
19   and dropped.
20        Q.   Did you call Division of Child and Family
21   Services before you interviewed her?
22        A.   No.
23        Q.   Because essentially, she could be a child in
24   danger that could come within the department and they
25   could take custody of her at the time.

1    A.   We notified them at the end, not before we

2  find out what she had to say.  We really didn't know.

3  I had taken the statement of the twelve-year-old, I

4  didn't know what this child was going to tell me,

5  disclose or not disclose.

6    Q.   Well, you knew from interviewing the

7  twelve-year-old, did you not, that V.V. had told the

8  twelve-year-old that she had been sexually abused?

9    A.   Correct.

10    Q.   So you are aware that there was certainly a

11  distinct possibility that she would be talking about

12  something like that, that she would be discussing the

13  fact that she was the victim of a sexual assault?

14    A.   Right.  But we don't notify the Division of

15  Children and Family until we have something more

16  specific than, you know, she's told me that.  If I have

17  the child in, I'm going to talk to her, I will find out

18  from the child what she actually discloses.

19    Q.   Had you thought about trying to contact Luisa

20  Colera (phonetically), the mother, without informing

21  her of the specifics and having her brought down to the

22  police station so she could be in a position to make a

23  decision as to how to proceed with her own child, at

24  least to be notified of what's going on?

25    A.   Yes, I thought about that.  And again, like I

1  said, she was staying with the suspect at the time and

2  according to the child, Mom is heavily medicated

3  because she suffers from fibromyalgia and clusters in

4  the brain and so forth and so forth.  And she stated

5  she was staying with Grandma because they live with

6  Grandma but Mom was staying on the beach with Mr.

7  Fisher.

8          But yes, I thought about calling her and

9  called the grandmother and when we didn't get any

10 contact there, we called the State Attorney's Office

11 and I --

12     Q.   Do you know where the grandmother was in

13 terms of where she was staying at the time?  You had a

14 phone number but did you have an address?

15     A.   In Miami.

16     Q.   Did you consider having a police vehicle go

17 and pick her up and bring her to the station?

18     A.   At two o'clock in the morning, no, I did

19 not.  Sorry.

20     Q.   I'm just asking.  Don't apologize.  I'm not

21 saying that you should have necessarily.  I'm just

22 asking if you did.

23          After you took V.V.'s statement, did that

24 complete your investigation at the police department

25 that morning?

1    A.    That night, yes, that morning.   Morning,

2  yes.

3    Q.    And then what happened?   Now we are on to

4  August 2nd, right?

5    A.    Correct.

6    Q.    What happened next?

7    A.    I went home and went to sleep at that point.

8  And I was notified -- actually my sergeant called me

9  and said, "What is this about a guy who is an ex-cop

10  who is armed that, you know, we are supposed to be

11  looking for or something?"   And I don't remember, I was

12  half asleep, I think I gave him a brief description,

13  some brief information.   Probably about eleven o'clock

14  in the morning or so, I contacted them or 11:30 in the

15  morning and Detective Olivera advised me that they had

16  just taken the suspect into custody and that he was

17  being transported to the police station.

18    Q.    Now, when you said you finished whatever time

19  you finished, two or three o'clock in the morning of

20  the 2nd, where was the investigation?   What is the

21  status?   Was there a BOLO, was there a request to

22  arrest, did you intend to get an arrest warrant?   What

23  was the status?

24    A.    No, I had actually typed up an arrest

25  affidavit and had discussed with Detective Borges

1   (phonetically), who had been called in also with me and

2   I believe the midnight lieutenant, and I didn't feel

3   comfortable with the possibility of weapons in the

4   house, to go knocking on the door at three o'clock in

5   the morning.  I thought about calling them and having

6   them come to the police station.  However, I didn't

7   think that Mr. Marciano would be responding at three

8   o'clock in the morning to pick up his girlfriend's

9   kid.

10          So I just advised the midnight lieutenant,

11  who I think later on he decided he would just put a

12  police officer outside of the building to watch the

13  building.  He did ask me to make sure the arrest

14  affidavit was typed up, which it was, and I had left

15  the arrest affidavit at the front desk of the police

16  station.

17          I think the next morning when the detectives

18  and my sergeant came in, they didn't know where the

19  arrest affidavit was, they didn't know an arrest

20  affidavit had been filled out, but they knew I had P.C.

21  for the arrest.  So they went to try to locate Mr.

22  Fisher and take him into custody and detain him for me

23  until I was notified or I did the A-Form or whatever

24  the case may be.

25          Q.   When you went through this entire series of

```
 1   statements, the three statements that you took, was
 2   there any indication to you that there would be any
 3   physical evidence at all in the apartment that would
 4   assist in the prosecution or the arrest?
 5        A.   Physical evidence as far as --
 6        Q.   Any kind of --
 7        A.   For the sexual battery?
 8        Q.   Yes, any kind of corroborative evidence for
 9   the assault?
10        A.   No, other than possibly the layout of the
11   apartment, like in comparison to where she said she was
12   laying on the couch and the others were watching T.V.,
13   things of that nature.
14        Q.   So at that point, you had no real indication
15   that there was any real evidence related to the case
16   that could be found in the apartment, no evidence to
17   the case, no evidence that would prove the case or no
18   evidence that would corroborate?  This is really a
19   testimonial, since there was no penetration, there
20   would be no expert testimony whatsoever?
21        A.   No, I didn't think there was anything in the
22   apartment.  There was concern about numerous firearms
23   that the children had both disclosed.
24        Q.   Are you aware of how the arrest actually
25   occurred?
```

1      A.   No.

2      Q.   You haven't spoken to them about the arrest,

3  the officers who went to the scene?

4      A.   No, other than they took him into custody and

5  they located the weapons and the I.D.'s, the numerous

6  I.D.'s.

7      Q.   Do you know how they located those?

8      A.   Not specifically.  I do know that they were

9  saying that Mr. Fisher was telling them where the

10  things were.

11      Q.   Mr. Fisher was telling them where what things

12  were?

13      A.   Where the firearms were located within the

14  apartment.

15      Q.   Did they tell you how they approached the

16  apartment or how they actually placed Mr. Fisher in

17  custody?

18      A.   No, they did not.

19      Q.   Was there any indication that Luisa Colera

20  was in any way involved in the offense?

21      A.   No, at that point I didn't know if she had

22  knowledge or not other than that she had been told and

23  she said she didn't want to report it.  My intention

24  was to talk to her and find out if she did have

25  knowledge or had the slightest inkling that something

1   was going on at the time of the incident or if she had

2   seen or heard anything.  Eventually, though, after I

3   came back to the police station and had interviewed Mr.

4   Fisher, she refused to talk to me at that point.

5        Q.   Did you ever talk to or see A.V., the

6   brother?

7        A.   No, actually the -- I did get a hold of Ms.

8   Bocanegra that morning somewhere in between there, she

9   kept leaving me messages, I keep calling her back.  I

10   was trying to interview people and then process Mr.

11   Fisher.  And she kept leaving me messages, I tried

12   calling her back, she would -- she had agreed she would

13   bring A.V. to the police station and then she didn't.

14   She said, "My daughter is downstairs.  I haven't talked

15   to her yet."

16        Finally I went downstairs and her daughter

17   had left.  And when her daughter came back, she refused

18   to talk to me and she never showed up with the boy.  I

19   never did go back and interview him because I felt

20   later on -- found out later on from the prosecutor that

21   Luisa had shown up with an attorney and her daughter

22   and had recanted the whole story.  So I didn't think

23   that I should even pursue -- attempt to continue

24   pursuing trying to interview the boy because I didn't

25   think that they would be cooperating at that point.

1    Q.    So what we have now with V.V. recanting, we

2    have basically the testimony of Y.D.?

3    A.    Just the twelve-year-old, correct.

4    Q.    And no evidence to support her testimony,

5    just her testimony?

6    A.    Correct.  Now.  At the time of my arrest, I

7    had V.V. corroborating everything.

8    Q.    I understand.

9         Had you interviewed A.V. and he had told you

10   that in fact what had happened was that Y.D. was being

11   tickled and he saw it at that time in the apartment,

12   what impact would that have had on you, that it was not

13   a sexual touching of anyone?

14   A.    I would have probably run it past the

15   prosecutor before I even attempted because I would not

16   want to make a judgment call as far as one child

17   saying, "No, it was just tickling," and the other one

18   saying, "No, he was poking me."  Granted, by the same

19   token, if she's claiming he was reaching underneath the

20   sheets, that doesn't necessarily mean that A.V. would

21   have seen what was going on underneath the sheets.

22        But in that case, I probably would not have

23   felt comfortable making the arrest just on her

24   statement and nobody else corroborating.  And

25   therefore, I would have had the State Attorney make the

1   ultimate decision and they would surely, depending on

2   how strong a case they feel they have, they will say,

3   "Yes, go ahead and arrest," or "We are not going to

4   file it," and then I just close it that way.

5        Q.   There is an ending paragraph to your report

6   that relates to a more recent statement about some

7   things that Y.D. had been involved in.

8        A.   I'm sorry?

9        Q.   In your report at the end there was a

10  discussion about -- I guess it was a statement that was

11  made by the defense lawyer that preceded me to

12  Detective Olivera.   --

13       A.   Yes.

14       Q.   -- in his deposition.   Could you read that

15  notation to me?

16       A.   It says, "On 9-26-02, Detective Olivera was

17  advised during deposition by the defense attorney,

18  Ronald Guralnick, that Y.D. is a member of a street

19  gang, has an eighteen-year-old boyfriend, drinks

20  alcoholic beverages, stays out all night and whose

21  mother has knowledge of this activity.   Detective

22  Olivera reported the allegations to the Department of

23  Children and Family's abuse hotline."

24       Q.   If in fact that's true and Mr. Fisher

25  attempted to intercede and stop that behavior, if in

1  fact those two things were known to you at the time

2  Y.D. told you what she told you about Mr. Fisher, would

3  you have inquired of Y.D. whether that's true?  Do you

4  follow my question?

5      A.   No, I kind of got lost.

6      Q.   I'm looking for a motive for this girl.  And

7  I mean if you are a parent, one of your worst

8  nightmares is for someone to tell you that your child

9  is using alcohol or drugs, underage and hanging out

10  with the wrong crowd and doing bad things.  And not

11  knowing whether to confront the kid, not knowing

12  whether to ignore it -- which we can't ignore things

13  as parents -- or how to deal with it.  And if in fact

14  someone else comes in and says, "That's wrong and it's

15  got to stop," but it's not her parents, it may give her

16  a motive --

17      A.   To retaliate?

18      Q.   -- to retaliate or to preempt and attack him

19  before he gets a chance to stop her and stop what she's

20  doing.  Had you known that, what's in that report now,

21  would you have asked her about it to find out if

22  perhaps there was a motive here?

23      A.   Yes.  If I had --

24      Q.   If you had that knowledge?

25      A.   If I had knowledge, that there was a

1   possibility that there was a reason why she was making

2   false accusations, yes.  But when I'm looking at the

3   totality of the circumstances --

4       Q.   At the time you were involved --

5       A.   We have a twelve-year-old telling me one

6   thing and a sixteen-year-old, who is the girlfriend's

7   daughter, not only corroborating but indicating that

8   things have happened to her over the past also.  Yes, I

9   would wonder if there is a reason, if there was an

10   attack, if there is retaliation.  We deal with these on

11   a daily basis, which is kids make up stories because

12   they don't like the discipline they are getting.  But I

13   was looking at the totality of, you know, the

14   corroborating statements because I knew that I -- this

15   was a statement only case and not a physical evidence

16   one.  Unless she did go to the Rape Treatment Center

17   and all of a sudden they said she has been raped and

18   then we would have pursued other avenues.  Not

19   necessarily indicating that Mr. Fisher would have raped

20   her, but it would have been pursued further in a

21   different way.

22       Q.   Did you get a copy of the Rape Treatment

23   report?

24       A.   On Y.D., yes.

25       Q.   What does it indicate to you, anything?

1    A.    They told me everything appeared normal, it

2  didn't show anything.  She wasn't making allegations of

3  any penetration.

4    Q.    Did it appear as if she had had any sexual

5  activity at all?  Was there any proof that she had ever

6  had sexual activity -- I'm not talking about

7  penetration -- with Mr. Fisher?

8    A.    No.  And actually, I remember asking her and

9  she said she was a virgin.  She had made a promise that

10  she would stay a virgin until she got married or found

11  the guy that she would marry.  It's not in my notes but

12  I remember, now that you said this, it jarred my memory

13  all of a sudden.  I thought I would have written it

14  down but I must not have.

15    Q.    The hymen was intact, as I recall the

16  examination showed?  Not that that is dispositive.

17    A.    If you can read the handwriting.  It says

18  smooth edges, estrogen effect.  I had called back to

19  try to verify some things.

20    Q.    That's my recollection.  But I brought the

21  doctor in.  Hopefully the doctor will show up to make

22  sure that that's accurate.  My problem is, I didn't

23  take the deposition of Y.D., I wasn't the lawyer in the

24  case at the time.

25         You normally check the background of

1   individuals for priors.   I assume you did it in this

2   case under his names, his a/k/a's, etcetera?

3          A.   Yes, we tried running all sorts of names.

4          Q.   No priors?

5          A.   We sent fingerprints to the F.B.I., came back

6   with no fingerprints on file, as far as I know.

7          Q.   Did that strike you as being a little

8   unusual, a fifty-five-year-old guy, no prior arrests,

9   no allegations against him, in a case like this?

10         A.   It did.   However, there were also indications

11  that he might have been working with the C.I.A. also,

12  at which point --

13         Q.   Who knows?

14         A.   Exactly.   The C.I.A. has the power to do

15  whatever they want to do and that doesn't necessarily

16  mean they are going to tell other law enforcement.   We

17  are just peons in the spectrum.   I mean I did notify --

18  because there were claims that he had worked with the

19  C.I.A. and other undercover agencies and I don't know

20  if --

21              (Discussion off the record.)

22              THE WITNESS:   But there were eventually

23         claims that he had done undercover work with

24         federal -- he called them feds, the feds.

25              MR. ROTHMAN:

1    Q.   It's been confirmed.

2    A.   Well, no, I made phone calls.   I made some

3  phone calls, some people said they had used him, other

4  people said they hadn't.

5    Q.   I think one of the guys in your department

6  had worked with him, Peter.

7    A.   I don't know his first name.

8    Q.   Peter Ess (phonetically)?

9    A.   Ess is the last name.   He said he had -- they

10 had used him while he was working with the feds.   So it

11 wouldn't have been any Miami Beach thing, it would have

12 been the feds' thing.

13      I did call -- it's hard when they have one of

14 these huge agencies that has numerous different areas

15 that they handle and different offices.   It's hard to

16 pinpoint exactly.   Someone could say "Yes" or "No."

17 But generally speaking, I did contact somebody, they

18 did show some record of him having done some work in

19 the New York or New Jersey area.

20      I did contact the C.I.A., believe it or not,

21 and they wouldn't tell me anything.   I said, "For your

22 knowledge, if he is one of yours, you may need -- I'm

23 giving you the courtesy to let you know that this has

24 occurred and this has been investigated and I have made

25 an arrest."   And in that instance, actually the C.I.A.

1   guy said, "Well, that's odd that a man this far along

2   wouldn't show previous record of that nature."  And I

3   said, "However, if he's working for the C.I.A., you

4   guys can erase everything that you want to erase."  And

5   I left it like that.

6        Q.   Have you pretty much described everything

7   that you have done in this case?  Obviously things

8   happened that you weren't involved in after the fact.

9   There was not much follow-up.  Nothing is on the

10  computer, as far as you know?

11       A.   There is porno but borderline.  We couldn't

12  say that they were underage so we left it at that.

13       Q.   Who discovered that?

14       A.   We had the signed consent from him to take

15  the computer and we took it to the Secret Service and

16  the Secret Service gave me back this report and they

17  said there is some porno but it's borderline whether

18  it's child or not.  So we didn't pursue that one

19  further.

20       Q.   Well, knowing the Secret Service, borderline

21  to them, it probably means they appear to be over

22  thirty years old.  They are very conservative.  Do you

23  have a report?  Is it a written report?

24       A.   (Indicating.)  I had specifically asked them

25  to look for any pornography or fraud because of the

1    multiple identities and badges and allegations that he

2    was a retired N.Y.P.D. and N.Y.P.D. said they never had

3    anybody by that name.  And they did type something up

4    there but it was on another case he had worked and it

5    wasn't a -- Secret Service thought it was a fraud thing

6    but it was actually a communication with somebody he

7    was working with on another case, so it wasn't a fraud,

8    it was information he was passing along.

9        Q.   Your files are confidential, so someone can't

10   get to this?

11       A.   No, this is juvenile, this is confidential.

12       Q.   I see stuff on here which is exactly what he

13   was talking about.  It's undercover work.

14       A.   If anything eventually gets released, it

15   would be the O.I. and the supplemental reports and even

16   then, all the juvenile information will be blackened

17   out.  So none of the juvenile information is read.  But

18   no, the rest of the file is mine and it is kept locked

19   in my office and my cabinet.

20           MR. ROTHMAN:  I think we have exhausted the

21       subject.  Thank you.  When it is typed up, you

22       will read?

23

24

25

1          THE WITNESS:  Read.

2          (Thereupon, formalities having not been

3     waived, the deposition was concluded at 11:40

4     a.m.)

5

6

7                 _____
                  DETECTIVE IVETTE DOMINGUEZ

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

STATE OF FLORIDA  )

COUNTY  OF  DADE )


        I, SYLVIA EVANS, Shorthand Reporter and

Notary Public for the State of Florida at Large,

certify that I was authorized to and did

stenographically report the deposition of DETECTIVE

IVETTE DOMINGUEZ; that a review of the transcript was

requested; and that the transcript is a true and

correct record of the testimony given.

        I further certify that DETECTIVE IVETTE

DOMINGUEZ personally appeared before me and was duly

sworn.

        I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

        Witness my hand and seal this 30th day of

January, 2003.


SYLVIA EVANS

SYLVIA EVANS
MY COMMISSION # CC 837050
EXPIRES: Jun 12, 2003

SYLVIA EVANS COURT REPORTING, INC.
2100 Ponce De Leon Boulevard, Suite 1040
Coral Gables, Florida  33134
(305) 445-5503

```
 1                January 30, 2003

 2   FROM:        SYLVIA EVANS COURT REPORTING, INC.
                  2100 PONCE DE LEON BOULEVARD
 3                SUITE 1040
                  CORAL GABLES, FLORIDA   33134
 4                PHONE:   (305) 445-5503

 5   TO:          DETECTIVE IVETTE DOMINGUEZ
                  Miami Beach Police Department
 6                1100 Washington Avenue
                  Miami Beach, FL   33139
 7
     RE:          Deposition of Yourself
 8
     CASE:        THE STATE OF FLORIDA Vs.
 9                CARL MARCIANO a/k/a MATTHEW FISHER a/k/a
                  SEAN MERRICK a/k/a PAUL BOOKER
10
     CASE #:      F02-22910
11
     Dear Detective Dominguez:
12
          Your deposition taken for use in the above-styled
13   action on the 22nd day of January, 2003, has been
     transcribed.
14
          You may arrange to read and sign the transcript by
15   calling Sylvia Evans Court Reporting, Inc., at (305)
     445-5503.
16
          If you have not made such arrangements by February
17   13th, 2003, said transcript will be filed without
     further notice.
18

19
                      Very truly yours,
20

21

22                    SYLVIA EVANS
                      Court Reporter
23

24

25
```

1        IN THE CIRCUIT COURT OF THE 11TH
         JUDICIAL CIRCUIT IN AND FOR
2        MIAMI-DADE COUNTY, FLORIDA

3           CASE NO: F02-22910

4   THE STATE OF FLORIDA,

5        Plaintiff,

6   vs.

7   CARL MARCIANO a/k/a
    MATTHEW FISHER a/k/a
8   SEAN MERRICK a/k/a
    PAUL BOOKER,
9
         Defendant.
10

11   _____

12

13

14           Public Defender's Office
             1320 N.W. 14th Street
15           Miami, Florida  33125
             Wednesday, January 22nd, 2003
16           11:45 A.M.

17

18

19      DEPOSITION OF SERGEANT RICHARD GULLAGE

20      Taken before Sylvia Evans, Notary Public for the

21   State of Florida at Large, pursuant to Notice of Taking

22   Deposition filed in the above cause.

23

24

25

**COURT EXHIBIT**

CASE NO. 02-20857
CR - Seitz

EXHIBIT NO. 3

SYLVIA EVANS COURT REPORTING, INC.
2100 Ponce De Leon Boulevard, Suite 1040
Coral Gables, Florida  33134
(305) 445-5503

1

2

3

4

5

6

7

A P P E A R A N C E S

8

NO APPEARANCE
On behalf of Plaintiff.

9

DAVID ROTHMAN, ESQ.

10

THORNTON & ROTHMAN, P.A.
2860 First Union Financial Center

11

200 South Biscayne Boulevard
Miami, Florida  33131

12

On behalf of Defendant.

13

14

15

16

I N D E X

17

Witness                                        Page

18

SERGEANT RICHARD GULLAGE          Direct. . . 3

19

20

21

22

23

24

25

1  Thereupon;

2              SERGEANT RICHARD GULLAGE

3  was called as a Witness and having been duly sworn, was

4  examined and testified as follows:

5              DIRECT EXAMINATION

6  BY MR. ROTHMAN:

7      Q.   Give me your basic data.

8      A.   Richard Gullage, police officer, fifteen

9  years, Miami Beach Police.  Currently assigned Juvenile

10 Investigations.

11     Q.   At some point you became involved in the

12 investigation relating to Matthew Fisher, also known as

13 Carl Marciano and some other people.

14          By the way, this is going to be sealed, you

15 can speak freely and not worry about what we are

16 talking about because it won't be of record.

17          You became involved in the investigation.  I

18 understand you were involved on August 2nd of 2002.

19 You went to Mr. Fisher's apartment where certain

20 evidence was seized and Mr. Fisher was taken into

21 custody and then returned to the police department

22 where he was formally arrested and interviewed by

23 Detective Dominguez.  What I am asking you about

24 mostly, probably ninety-nine percent, is what happened

25 from the point you got involved in the case and then

1    you went with the team that went over to the apartment.

2     So at some point you became knowledgeable about this

3    case.

4            To fill you in a little bit, which you

5    probably know but you may not remember, August 1st in

6    the evening hours, late evening hours is when Detective

7    Dominguez spoke with the two alleged victims in this

8    case, of the unlawful touching case.  She told us that

9    she got through with the interviews somewhere around

10   two or three o'clock in the morning, went home and went

11   to sleep, left a typed A-Form somewhere which she

12   thinks was not located, and she received a phone call,

13   I think she said it was from you, on the morning of the

14   2nd, "What the flock is going on here?"  And she barely

15   remembers the conversation because she was half

16   asleep.  Is that your first contact with the case?

17        A.    Yes.  I believe she got called in.  My first

18   contact whatsoever -- as the supervisor of the unit,

19   they normally call me first if they are going to have a

20   detective respond.  And I believe that night they

21   called me and I said, "Whoever it is, call them."  And

22   it happened to be Detective Dominguez.

23        Q.    And what did you know about the case at the

24   outset?

25        A.    I don't recall.  You know, it's a middle of

1  the night call and they call and say, "We've got this

2  case and we need a detective," and they give me briefly

3  what's going on.  My standard answer is to have

4  somebody come in.

5      Q.  And you assigned her.  She then picked up the

6  mantle and what's the next contact you had with her or

7  with the case?

8      A.  Normally my detectives keep me abreast of

9  what's going on.  She may have called me that night, I

10  don't recall.  Probably the following morning is when I

11  spoke to her and she told us what she had as far as the

12  Defendant or the guy that we were looking at, Matthew

13  Fisher, possibly being an ex-police officer, known to

14  carry a gun.  She felt it prudent to wait until the

15  following morning when we had more manpower to initiate

16  an arrest based on the facts of the case.

17      Q.  So did you take it upon yourself then to be

18  the group leader at that time to make the arrest or --

19      A.  Yes.  Apparently patrol, the uniformed patrol

20  division had assigned a marked unit to sit outside the

21  Defendant's apartment to see if he leaves and hopefully

22  take him into custody through a vehicle stop or if he

23  comes out of the apartment.  I was notified by one of

24  the uniformed supervisors that there was a unit indeed

25  sitting in front of his apartment building and waiting

1    on the description of the vehicle to come out and at

2    that time they would have initiated a traffic stop.

3         Q.    Which didn't happen obviously?

4         A.    Which didn't happen.

5         Q.    So you gather a team of detectives, officers

6    together to go to the apartment?

7         A.    Yes, Sir.

8         Q.    And I pretty much know who was involved in

9    that based on the report and I know you were involved

10   and Wolfe was involved and Prieto was involved and --

11        A.    Olivera and Sinkes.

12        Q.    Traveled over in separate vehicles, I assume?

13        A.    Yes.

14        Q.    What did you do when you got there?

15        A.    I believe Detective Olivera had an

16   acquaintance that worked at building management and he

17   briefly interviewed her as far as the subject, where he

18   lived, what apartment he was in, any type of history of

19   violence, anything along those lines.  At some point --

20   and we basically determined that he was home.  We tried

21   calling him a couple of times.

22             Let me just go right to it.  We called him a

23   couple times.  The first time, he either hung up or

24   didn't answer the phone.  The second time, he took the

25   phone off the receiver.  So at some point in time I

1  made the determination to take building security up to

2  the apartment and attempt to arrest the subject.

3      Q.   Is this the same individual that you took up

4  to the apartment?  This is a single individual?

5      A.   Yes.

6      Q.   What is the point of taking him up, just for

7  security or directions?

8      A.   Just for directions and as a representation

9  of the building.  We were all in plainclothes.  There

10 may have been other uniformed officers standing by but

11 I don't recall if we took them up to the floor or not.

12     Q.   So the entire group went up to the door of

13 the apartment?

14     A.   Yes.

15     Q.   What happened then?

16     A.   We knocked on the door, as we had security

17 with us.  We knocked on the door with security,

18 identified -- he identified himself as building

19 security, the Defendant opened the door.  At that point

20 in time, we basically arrested him, took him down.

21     Q.   So you had building security be the face that

22 would be seen through the peephole?

23     A.   Yes, Sir.

24     Q.   And he knocked.  At some point someone

25 answered?

1        A.    Right.

2        Q.    Male voice?

3        A.    Male voice.

4        Q.    And he identified himself as building

5   security?

6        A.    Yes, Sir.

7        Q.    Did he ask who was there?  Did the person --

8        A.    Behind the door, prior to opening the door?

9        Q.    Yes.

10       A.    I believe he just said, "Building security."

11   I don't recall.  I think he may have opened the door

12   right away.  I don't recall.

13       Q.    And he was right there.  He opened the door,

14   the door opens in, not out?

15       A.    The door opens in, I believe.  I don't

16   remember.

17       Q.    Can a door open in?

18       A.    On the exterior of a building, it has to open

19   out.  But I don't remember inside.

20       Q.    So he's standing right in the doorway?

21       A.    Yes, Sir.

22       Q.    And at that point, are your weapons drawn?

23       A.    Weapons are drawn.  As soon as he opens the

24   door, we identify ourselves as City of Miami Beach

25   Police Department officers and for him basically not to

1    move and put his hands behind his back.

2         Q.    Did he do anything at all other than put his

3    hands behind his back?

4         A.    No.

5         Q.    Did anyone ask him to step outside?

6         A.    No, I don't remember.

7         Q.    That could have been done but you don't know

8    if it was done?

9         A.    No.

10        Q.    And at that point, you were there to arrest

11   him, that's why you were there?

12        A.    Yes, Sir.

13        Q.    And so he was right there, he was within

14   arm's reach of five of you, six of you, maybe one or

15   two of the five or six of you?

16        A.    Right.

17        Q.    But instead, you went inside the apartment?

18        A.    We asked him if we could come in the

19   apartment.  Well, we went into the apartment rather

20   than -- we don't want him moving, for obvious reasons,

21   officers' safety reasons, and we handcuffed him inside

22   the doorway.

23        Q.    A split second after you come in?

24        A.    Split second.  We are not going to wait

25   around because we know he has weapons.  We asked him

1    all the pertinent questions, if there is any weapons in

2    the apartment, any other people in the apartment,

3    things such as that.  Handcuff him ask if we could come

4    in.  He's very cooperative.  He says, "Yes.  I have no

5    questions."  And we basically sit him down on his

6    couch.

7         Q.   Is there any reason you didn't just arrest

8    him and take him with you?

9         A.   Is there any reason why we did not arrest him

10   and take him with us?  I think he requested clothing

11   because he was in shorts and that was it, that's all he

12   had on.

13        Q.   So what happened after that, after you had

14   him handcuffed?

15        A.   Handcuffed, he was sitting on his couch, and

16   we engaged in conversation reference to his

17   identification, at which time -- and we also asked him

18   about the weapons.  Oh, we have to go back.  We also,

19   when we asked him if there was any other individuals in

20   the apartment, we -- he did state that his girlfriend

21   was in the bed.  I had Detective Wolfe, Cathy Wolfe, go

22   in there and take her into custody also, strictly for

23   officers' safety.

24        Q.   When she went in there, was --

25        A.   To the bedroom.

1      Q.    Luisa Colera was her name.   Do you know if

2  she was asleep or awake?

3      A.    I think she was sleeping.

4      Q.    So Detective Wolfe would have roused her and

5  what did you do with her?

6      A.    I don't think she had clothing, I think she

7  had to get dressed and then we took her out to the same

8  room that Mr. Marciano was in.

9      Q.    Now, at some point there was a search of the

10  apartment.

11      A.    Right.

12      Q.    What was the purpose of the search?

13      A.    We asked Mr. Marciano if there was any other

14  or if he had a weapon and if there was any additional

15  weapons.  He basically told us that there were weapons

16  and exactly where the weapons were.  So we took any

17  weapons that were there into custody.

18      Q.    So all you were looking for are weapons?

19      A.    Yes, Sir.

20      Q.    And he told you where the weapons were?

21      A.    (Witness nodded.)

22      Q.    Exactly where they were?

23      A.    Exactly where they were.

24      Q.    So you took the weapons?

25      A.    Well, they were -- the weapons were in

1   various like bags and cases and gun packs and stuff

2   like that.

3       Q.   Why did you take those weapons in?  Why did

4   you take them in as opposed to simply removing Mr.

5   Fisher from the apartment?

6       A.   Well, based on the facts of the case, we

7   don't even know what this person's name -- real name

8   is.  So I think it would be a good idea to check the

9   weapons, make sure the weapons are legally registered

10  to whoever, and find out if he is indeed allowed to

11  possess them.

12      Q.   So the reason you then searched for the

13  weapons and were going to seize the weapons was to make

14  sure that he was possessing them lawfully?

15      A.   Right.

16      Q.   And that was done and verified that they were

17  all legal, correct?  I think it was.

18      A.   Not right then.

19      Q.   You said he was sitting by the bed?

20      A.   Well, when you run a weapon, it just comes

21  back either stolen or not.  That necessarily doesn't

22  tell you if it's legally possessed by the subject.

23      Q.   It's not stolen.  What's not legal about it?

24      A.   Well, if it's purchased in someone else's

25  name.  If you take a fake name and purchase a gun,

1    that's against the law.

2        Q.    Did you have any indication that he had a

3    fake name at that time?

4        A.    Yeah, in his wallet I believe there was like

5    three different identifications as well as a badge of

6    -- a New York police badge and I think some other

7    documents that were questionable.

8        Q.    Where did you get his wallet from?

9        A.    I think it was in the same bag that his -- I

10   guess his primary weapon was in.  He had an arsenal

11   there.

12       Q.    Which he's lawfully allowed to do.

13             At some point there was a seizure of

14   passports and other documentation that related to

15   identification.  How did that take place, do you know?

16       A.    Specifically, no.  But I remember at some

17   point in time, all the guns and identification

18   documentation was laid on the bed and for investigatory

19   purposes is why we took those into custody.

20       Q.    Now, a passport, from the outside you would

21   see a cover, it wouldn't have a name, right?  U.S.

22   passports don't have the name on the cover?

23       A.    Right.

24       Q.    You have to open them up to see the name?

25       A.    Right.

14

1      Q.    Who opened them up to see what name those

2   passports were in?

3      A.    I don't know.

4      Q.    It wasn't you?

5      A.    No.   I could have, I mean I'm not saying it

6   definitely wasn't me.

7      Q.    And you wouldn't know that the passports were

8   his or in a different name until you opened up the

9   cover to examine it?

10     A.    That's correct.

11     Q.    But you don't know who did that?   You don't

12  know which of the officers?

13     A.    One of the detectives or myself.   I mean it

14  could have been me.   As the supervisor, I'm basically

15  supervising the whole thing.

16           (Discussion off the record.)

17           MR. ROTHMAN:

18     Q.    Did you talk to Mr. Fisher about, after

19  learning about these different names and the pictures,

20  the identities, the basis of that or where that came

21  in?   At some point you talked to him?

22     A.    Yeah, I mean I had conversation with him,

23  nothing extensive though, just basically why.

24     Q.    Without putting it on the record, he told you

25  why?

```
 1        A.   Yes.
 2        Q.   And you called to verify that or just passed
 3   along the information?
 4        A.   No, he asked me during the midst of this to
 5   call --
 6        Q.   To call an Assistant U.S. Attorney?
 7        A.   It was right on his cell phone, it's the
 8   first number that came up on the cell phone.  I wrote
 9   the number down.  I didn't call him from his cell
10   phone, I called him later on, after we were back at the
11   station.
12        Q.   Is there any reason you know of that an
13   arrest warrant was not obtained in this case?
14        A.   The reason --
15        Q.   I'm not saying it had to be, but I'm asking
16   if there was any reason it wasn't?
17        A.   Just the mere fact that it deals with
18   children.  And routinely some of the suspects that prey
19   on children have more than one child that they prey
20   on.  So we take it very serious and we like to bring
21   these people to justice as soon as possible.
22        Q.   The actual entry into his apartment was about
23   eight or nine hours after Detective Dominguez went
24   home.
25        A.   I agree.
```

1       Q.    You are a police officer and you have been a

2  police officer probably over twenty years?

3       A.    Fifteen.

4       Q.    How many nighttime search warrants or arrest

5  warrants have you been involved in?

6       A.    A few.

7       Q.    It doesn't take that much time to put it down

8  on a piece of paper about the basis of the arrest, get

9  the on-duty judge to sign it, and go out and arrest the

10  person, whether it's three, four, five, six, seven,

11  it's not a big deal?

12       A.    It can be done.

13       Q.    There is a fast way of doing it, but frankly

14  speaking, it was easier than getting a warrant.   You

15  wouldn't necessarily need a warrant if you had probable

16  cause but it is easier not to get the warrant than to

17  get the warrant?

18       A.    It's easier not to get the warrant than to

19  get the warrant?   Of course.

20       Q.    So other than saving some work, it really

21  didn't speed up the arrest, did it?

22       A.    Well, we didn't know, number one, who we were

23  dealing with.   We were dealing with a possible armed

24  subject and we were dealing with a subject that preys

25  on children and we had probable cause.   And based on

1    those facts is why we decided not to get a warrant.

2        Q.    And I'm not demeaning her in any way, but

3    Detective Dominguez told us that after she took the

4    statements, she went home and went to sleep.  I mean

5    she definitely could have gone out at three o'clock in

6    the morning and arrested him or had a team to go out

7    and arrest him.  If you are that worried about

8    protecting children, you go out at that time and make

9    the arrest.

10       A.    True.

11       Q.    Any reason why you guys didn't get a search

12   warrant before you searched the apartment?

13       A.    We had consent.  He gave us consent.

14       Q.    Consent to do what?

15       A.    To locate all of his guns.

16       Q.    How did that happen?

17       A.    We asked him if he had any other weapons in

18   the apartment, he said yes and then he told us exactly

19   where they were.  And that was the extent of the

20   search.  There was nothing else searched.

21       Q.    When you said you asked him if he had guns,

22   at that point he had not been given Miranda Rights,

23   right?

24       A.    Right.

25       Q.    So at that point you were asking him

1    questions?

2        A.   Well, I'm not sure.  I didn't give him

3    Miranda Rights and when I speak to "we asked him," I'm

4    speaking in general terms.  I don't know who

5    specifically asked him.

6        Q.   The question is, but the general questions

7    were, "Are there guns and where are they?"  And he told

8    you, "Yes, there are guns," and where they were.  Did

9    you ask him or did you hear anybody ask him, "Would it

10   be okay if we searched your apartment and seized the

11   guns?"  Those two questions were not asked?

12       A.   "Would it be okay if we --"

13       Q.   "Looked for the guns?"

14       A.   "-- look for the guns," was asked.  Whether

15   or not we could seize them, I don't think we asked if

16   we could seize them.

17       Q.   Who asked if you could locate the guns?

18       A.   I don't know who but we said, "We are going

19   to locate the guns.  Do you have a problem with that?"

20       Q.   Well, saying, "We are going to locate the

21   guns, do you have a problem," is different than --

22       A.   "Would you mind if we looked for them?"  I

23   believe we asked him.  He understood that there was a

24   question and we were -- and we were asking him to

25   cooperate, which he did consensually.

1      Q.    Well, he was cooperative.  But the question

2  I'm asking is, did the cooperation include a request

3  for permission to search or was it cooperation, he was

4  cooperative and told you everything he wanted, and then

5  for whatever reason you decided to make sure everyone

6  was safe and the guns were secure and the guns were

7  his?  There is a difference and I'm trying to find out

8  if you can recall, if you are sure as to which of the

9  two paths or maybe a combination of the two you chose.

10     A.    To the best of my recollection, he was very

11  cooperative and gave us consent to locate the guns.

12  Did we specifically question him if we could seize the

13  guns?  Probably not.

14     Q.    Did you ever ask him for permission to look

15  for or to seize any documents relating to

16  identification?

17     A.    Again, to the best of my recollection, the

18  identification documents and everything were with the

19  guns and that he did have some identification that was

20  like his wallet or something like that.

21     Q.    But the passports that were seized, can you

22  tell me that they were with the guns in the exact same

23  place or were they in a place that was near the guns?

24     A.    No.

25     Q.    You don't remember?

20

```
 1        A.    (Witness shook his head.)

 2        Q.    Did you have information that he had

 3   committed a crime or was about to commit a crime in

 4   regards to either obtaining or using false passports at

 5   the time you were in his apartment?

 6        A.    No.  You are talking specifically about using

 7   passports?

 8        Q.    Or obtaining them illegally.  In other words,

 9   whether before you went and got the passports, looked

10   at them and asked him questions about it, did you know

11   what was going on with the passports?

12        A.    Before that, no, I didn't know what was going

13   on.

14        Q.    One of the detectives -- and I think it was

15   Olivera -- said in his deposition, which I did not

16   take, Mr. Guralnick took that deposition before I

17   substituted for him -- that it was his understanding

18   that they were supposed to -- "they," meaning the team

19   -- was supposed to detain Mr. Fisher for questioning

20   by Detective Dominguez, detain him and transport him to

21   the station as opposed to making a formal arrest for

22   the offense for which he was ultimately arrested.  I'm

23   not sure that's a distinction of any significance but

24   is that consistent with what your recollection is that

25   your understanding was at the time?
```

1    A.    You are asking me, if I get this straight, we

2    were -- you have got to be -- you are asking if we were

3    told -- the request was made to either detain him or go

4    ahead and make the arrest?

5    Q.    Detective Olivera said in his deposition -- I

6    hate reading other people's depositions -- Rigoberto

7    Olivera --

8    A.    Let me just -- maybe to help, normally when a

9    detective is assigned a case, which this obviously the

10   lead detective was Detective Ivette Dominguez in this

11   case.  She did all the interviews, did the background

12   and she typed up an arrest form.  Well, that's her

13   case.  If other detectives want to assist with either

14   an arrest or locating a subject, that's fine.  But I

15   prefer it, as the supervisor -- and some people do it

16   differently, I'm sure -- but the way I was trained or

17   the way I have always done investigations as a

18   detective and then as a supervisor was if that's your

19   case, like I'm sure you probably agree, that it should

20   be that attorney or that detective that handles it all

21   the way through to see it to the end, not one guy does

22   the interview, one guy does the arrest.  I don't know

23   if that's what you are asking or not.  Yeah, we did

24   detain him for her to interview but she had established

25   probable cause already before the arrest.

```
 1          Q.    Let me get to his deposition so I ask the

 2   question consistent with what his answer was.   I want

 3   to use the right language.

 4                (Discussion off the record.)

 5          MR. ROTHMAN:

 6          Q.    What Detective Olivera said in the deposition

 7   was, and I will quote him, "All I was following was my

 8   orders which were to locate the person, detain him,

 9   cause Dominguez had to question him.  That's it."

10                And then the question was, "Am I correct to

11   say, since he's taken into custody and under arrest,

12   right, if the situation was that you had enough

13   information to arrest, that's what you would have

14   done?"

15                Answer, "To arrest, of course."

16                According to Detective Olivera, he said to

17   make an arrest and to take him into custody are two

18   different things.

19                Anyway, do you know that, what I just read to

20   you from Olivera's deposition, that was about detaining

21   him for questioning as opposed to making a formal

22   arrest, does that ring a bell as far as you are aware?

23   Is that what your charge was, that it was supposed to

24   be to detain Mr. Fisher or Mr. Marciano, bring him to

25   the station and Detective Dominguez was going to
```

```
 1    interview him or, "We were out there to make an arrest

 2    for lewd and lascivious," or sexual battery?  I think

 3    the A-Form says sexual battery.

 4         A.   Yeah, we were out there to make an arrest.

 5         Q.   Anything else you did on this case other than

 6    what we have described?  Were you involved in the

 7    statement that Mr. Fisher gave back at the station?

 8         A.   Yes, yeah, I did talk to him with Olivera, I

 9    believe.

10         Q.   You made no notes?

11         A.   Right.

12         Q.   The statement was eventually taped?

13         A.   Yeah -- I don't know, was it taped?

14         Q.   You have no independent recollection, my

15    guess, of the conversation you had with him prior to

16    going on the record and doing a taped statement?

17         A.   No.

18         Q.   That's it?  That's all you've got?

19         A.   That's it.

20         MR. ROTHMAN:  Thank you.  Read?

21         THE WITNESS:  Read.

22         (Thereupon, formalities having not been

23    waived, the deposition was concluded at 2:35 p.m.)

24

25    _____
      SERGEANT RICHARD GULLAGE
```

<u>CERTIFICATE</u>

STATE OF FLORIDA )

COUNTY  OF  DADE )

          I, SYLVIA EVANS, Shorthand Reporter and
Notary Public for the State of Florida at Large,
certify that I was authorized to and did
stenographically report the deposition of SERGEANT
RICHARD GULLAGE; that a review of the transcript was
requested; and that the transcript is a true and
correct record of the testimony given.

          I further certify that SERGEANT RICHARD
GULLAGE personally appeared before me and was duly
sworn.

          I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

          Witness my hand and seal this 30th day of
January, 2003.


                    _____
                         SYLVIA EVANS

                                   SYLVIA EVANS
                                   MY COMMISSION # CC 837050
                                   EXPIRES: Jun 17, 2006

          SYLVIA EVANS COURT REPORTING, INC.
          2100 Ponce De Leon Boulevard, Suite 1040
                  Coral Gables, Florida  33134
                       (305) 445-5503

1            January 30, 2003

2  FROM:      SYLVIA EVANS COURT REPORTING, INC.
              2100 PONCE DE LEON BOULEVARD
3             SUITE 1040
              CORAL GABLES, FLORIDA  33134
4             PHONE:  (305) 445-5503

5  TO:        SERGEANT RICHARD GULLAGE
              Miami Beach Police Department
6             1100 Washington Avenue
              Miami Beach, FL  33139

7
   RE:        Deposition of Yourself
8
   CASE:      THE STATE OF FLORIDA Vs.
9             CARL MARCIANO a/k/a MATTHEW FISHER a/k/a SEAN
              MERRICK a/k/a PAUL BOOKER
10
   CASE #:    F02-22910
11
   Dear Sergeant Gullage:
12
        Your deposition taken for use in the above-styled
13 action on the 22nd day of January, 2003, has been
   transcribed.
14
        You may arrange to read and sign the transcript by
15 calling Sylvia Evans Court Reporting, Inc., at (305)
   445-5503.
16
        If you have not made such arrangements by February
17 13th, 2003, said transcript will be filed without
   further notice.
18

19
                    Very truly yours,
20

21

22                  SYLVIA EVANS
                    Court Reporter
23

24

25